UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

10-60126-CR-ZLOCH/ROSENBAUM


THE UNITED STATES OF AMERICA, )
                              )
            PLAINTIFF,        )
                              )
        VS.                   )
                              )
DEBRA VILLEGAS,               )        THIS VOLUME:
                              )        PAGES 1 - 73
            DEFENDANT.        )
_____)


        TRANSCRIPT OF SENTENCING HAD BEFORE THE HONORABLE
WILLIAM J. ZLOCH, IN FORT LAUDERDALE, BROWARD COUNTY, FLORIDA,
ON FRIDAY, OCTOBER 8, 2010, IN THE ABOVE-STYLED MATTER.

APPEARANCES:
FOR THE GOVERNMENT:   JEFFREY KAPLAN, A.U.S.A.,
                      LAWRENCE D. LAVECCHIO, A.U.S.A.,
                      PAUL SCHWARTZ, A.U.S.A, AND
                      ALISON LEHR, A.U.S.A.
                      500 E. BROWARD BLVD., 7TH FLOOR
                      FT. LAUDERDALE, FL 33301 - 954 356-7255

FOR THE DEFENDANT:    ROBERT W. STICKNEY, ESQ.
                      POST OFFICE BOX 2448
                      FT. LAUDERDALE, FL 33303 - 954 767-8908


                    CARL SCHANZLEH

                OFFICIAL COURT REPORTER

                   U. S. COURTHOUSE

              299 E. BROWARD BLVD., 202B

            FORT LAUDERDALE, FLORIDA 33301

                   954 769-5488

1

2                          TABLE OF CONTENTS

3   WITNESSES:                      DIRECT   CROSS REDIRECT RECROSS

4   DR. LORI JEAN BUTTS .............. 8      28      30

5                          INDEX TO EXHIBITS

6   EXHIBITS                    MARKED FOR       RECEIVED
                                IDENTIFICATION   IN EVIDENCE
7
    DESCRIPTION              PAGE    LINE    PAGE    LINE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1  (FORT LAUDERDALE, BROWARD COUNTY, FLORIDA;  FRIDAY,

 2  OCTOBER 8, 2010, IN OPEN COURT.)

 3          THE COURT:  GOOD MORNING.  PLEASE BE SEATED.

 4          CALLING CASE NUMBER 10-60126-CRIMINAL.

 5          COUNSEL, WOULD YOU NOTE YOUR APPEARANCES FOR THE

 6  RECORD.

 7          MR. KAPLAN:  GOOD MORNING, YOUR HONOR.  JEFFREY

 8  KAPLAN.  ALSO SITTING AT COUNSEL TABLE IS LAWRENCE LAVECCHIO

 9  AND PAUL SCHWARTZ AND ALISON LEHR, ALL WITH U. S. ATTORNEY'S

10  OFFICE AND APPEARING ON BEHALF OF THE UNITED STATES.

11          THE COURT:  GOOD MORNING.

12          MR. STICKNEY:  GOOD MORNING, YOUR HONOR.  ROBERT

13  STICKNEY ON BEHALF OF DEBRA VILLEGAS WHO IS SEATED TO MY LEFT,

14  AND WITH ME IS AN ASSISTANT WITH MY OFFICE.

15          THE COURT:  GOOD MORNING.

16          LET THE RECORD REFLECT THAT DEBRA VILLEGAS IS PRESENT

17  AND IN THE COURTROOM.

18          CAN I HAVE THE REPRESENTATIVE FROM THE PROBATION

19  OFFICE NOTE HER APPEARANCE.

20          THE PROBATION OFFICER:  GOOD MORNING, YOUR HONOR.

21  REBECCA HILL ON BEHALF OF PROBATION.

22          THE COURT:  GOOD MORNING.

23          WE ARE HERE FOR SENTENCING.

24          MR. STICKNEY, HAVE YOU READ IN ITS ENTIRETY THE

25  REVISED PRESENTENCE REPORT AND THE ADDENDUM TO IT?
```

1          MR. STICKNEY:  YES, YOUR HONOR, I HAVE.

2          THE COURT:  AND HAVE YOU DISCUSSED THOSE PAPERS FULLY

3   WITH YOUR CLIENT?

4          MR. STICKNEY:  YES, YOUR HONOR.  I HAVE PROVIDED A

5   COPY VIA E-MAIL TO MY CLIENT AND SHE HAS INFORMED ME THAT

6   REVIEWED THAT TWICE.

7          THE COURT:  OTHER THAN WHAT HAS BEEN FILED IN WRITING

8   TITLED THE DEFENDANT'S OBJECTIONS TO THE PRESENTENCE

9   INVESTIGATION REPORT AND THE DEFENDANT'S MOTION FOR A DOWNWARD

10  DEPARTURE, ARE THERE ANY ADDITIONAL OBJECTIONS OR MOTIONS FROM

11  THE DEFENSE?

12         MR. STICKNEY:  NO, THERE -- WELL, NOT REGARDING THE

13  PSR.  WE WOULD REQUEST A VARIANCE PURSUANT TO 18, USC, SECTION

14  3553 LATER IN THE PROCEEDING, YOUR HONOR.

15         THERE IS A SCRIBNER'S ERROR THAT MR. KAPLAN IDENTIFIED

16  TO PROBATION ABOUT -- ON PARAGRAPH 57 OF THE PSR.  MY CLIENT

17  CAUGHT THAT ISSUE.  IT'S JUST AN ANNUAL INCOME FOR ONE YEAR.

18  WE HAVE CORRECTED IT WITH PROBATION ALREADY AND THEY ARE GOING

19  TO MODIFY PARAGRAPH 57 TO INCLUDE THE PROPER NUMBER.  IT DOES

20  NOT AFFECT THE SENTENCE, YOUR HONOR.

21         THE COURT:  ALL RIGHT.  BUT JUST SO THE RECORD IS

22  CLEAR, ANY ADDITIONAL OBJECTIONS OR MOTIONS FROM THE DEFENSE?

23         MR. STICKNEY:  NO, YOUR HONOR.

24         THE COURT:  ALL RIGHT, THANK YOU.

25         MISS VILLEGAS, HAVE YOU READ IN ITS ENTIRETY THE

1   REVISED PRESENTENCE REPORT AND THE ADDENDUM TO IT?

2          THE DEFENDANT:  YES, YOUR HONOR, I HAVE.

3          THE COURT:  AND HAVE YOU DISCUSSED THOSE PAPERS FULLY

4   WITH YOUR LAWYER?

5          THE DEFENDANT:  YES, YOUR HONOR, I HAVE.

6          THE COURT:  OTHER THAN WHAT HE HAS FILED IN WRITING ON

7   YOUR BEHALF DO YOU HAVE ANY ADDITIONAL OBJECTIONS OR ANY

8   ADDITIONAL MOTIONS TO ANYTHING CONTAINED IN THE REVISED PSR?

9          THE DEFENDANT:  NO, YOUR HONOR.

10          THE COURT:  ARE THERE ANY FROM THE GOVERNMENT?

11          MR. KAPLAN:  NONE FROM THE GOVERNMENT, YOUR HONOR.

12          THE COURT:  WHAT OBJECTIONS ARE STILL OUTSTANDING?

13          MR. STICKNEY:  YOUR HONOR, THANKFULLY WE HAVE RESOLVED

14   ALL OF THE OBJECTIONS TO THE PSR.  WE WORKED VERY CLOSELY WITH

15   THE U.S. ATTORNEY'S OFFICE AND WE HAVE ACCOMPLISHED THAT.

16   THANK YOU.

17          THE COURT:  ALL RIGHT.  THANK YOU.

18          THEN WHAT REMAINS IS THE DEFENDANT'S MOTION FOR A

19   DOWNWARD DEPARTURE AND/OR A VARIANCE.

20          I WILL HEAR FROM THE DEFENSE ON THAT, THEN I WILL HEAR

21   FROM THE GOVERNMENT, AND THEN WE WILL GO INTO FORMAL

22   SENTENCING.

23          HOWEVER, BEFORE I HEAR FROM THE DEFENSE I NEED TO MAKE

24   SURE THAT EVERYONE SITTING IN THIS COURTROOM CLEARLY

25   UNDERSTANDS EXACTLY WHAT IS GOING ON IN THIS PROCEEDING,

 1  ESPECIALLY IF YOU ARE INTERESTED IN ACCURATELY INFORMING THE
 2  CITIZENRY.

 3       THE GUIDELINE RANGE IS 292 MONTHS TO 365 MONTHS.  THE
 4  STATUTORY MAXIMUM IS 1O YEARS.  WHAT THAT MEANS FOR EVERYONE
 5  SITTING IN THIS COURTROOM IS THAT THE COURT CANNOT GO HIGHER
 6  THAN THE STATUTORY MAXIMUM.  THE STATUTORY MAXIMUM IS 1O YEARS.
 7  THE COURT CANNOT GO HIGHER THAN 1O YEARS.

 8       IF THE COURT WERE TO IMPOSE A SENTENCE OF 1O YEARS
 9  PLUS ONE DAY THAT WOULD BE AN ILLEGAL SENTENCE AND THE ELEVENTH
10  CIRCUIT WOULD REVERSE THE COURT.  SO THE GUIDELINE RANGE COULD
11  BE A THOUSAND YEARS BUT I AM BOUND BY THE STATUTORY MAXIMUM.  I
12  CANNOT GO HIGHER THAN 1O YEARS.  I WANT TO MAKE THAT ABSOLUTELY
13  CLEAR FOR EVERYONE SITTING IN THIS COURTROOM.

14       NOW, THE OTHER THING THAT I WOULD LIKE TO ASK THE
15  GOVERNMENT -- WELL, THAT IS ALL RIGHT.  I WILL ASK THE
16  GOVERNMENT WHEN THEY RESPOND TO THE MOTION.

17       GO AHEAD, MR. STICKNEY.

18       MR. STICKNEY:  YOUR HONOR, JUST AS AN OVERLAY OF WHAT
19  I WAS HOPING TO ACCOMPLISH TODAY IS I -- I AM NOT GOING TO CALL
20  ANY WITNESSES -- I AM SORRY, ANY FAMILY MEMBERS AS WITNESSES,
21  BUT I WOULD LIKE TO CALL MY CLIENT'S PSYCHOLOGIST WHO HAS BEEN
22  SEEING HER SINCE A YEAR AGO IN NOVEMBER.

23       THE COURT:  IN SUPPORT OF THE MOTION?

24       MR. STICKNEY:  IN SUPPORT OF THE MOTION AND IN SUPPORT
25  OF THE VARIANCE FACTORS BASED ON THE CHARACTERISTICS OF MY

 1 || CLIENT AND HER FAMILY HISTORY.

 2 ||         THE COURT:  ALL RIGHT.  GO AHEAD AND CALL YOUR

 3 || WITNESSES.

 4 ||         MR. STICKNEY:  I CALL DR. LORI BUTTS.

 5 ||         YOUR HONOR, ALSO MY CLIENT IS EXTREMELY NERVOUS.  IS

 6 || IT PERMISSIBLE FOR HER TO REMAIN SEATED IF SHE IS REFERRING --

 7 || IF SHE IS ADDRESSING THE COURT?

 8 ||         THE COURT:  THAT IS FINE.

 9 ||         PLEASE STEP UP TO THE WITNESS STAND.

10 ||         PLEASE REMAIN STANDING AND RAISE YOUR RIGHT HAND.

11 ||         (WITNESS SWORN)

12 ||         THE WITNESS:  YES, I DO.

13 ||         THE COURT:  THANK YOU.  PLEASE BE SEATED.

14 ||         PLEASE SPEAK DIRECTLY INTO THAT MICROPHONE.  THE CHAIR

15 || DOES NOT MOVE.  YOU HAVE TO SLIDE FORWARD IN THE CHAIR.

16 ||         PLEASE STATE YOUR FULL LEGAL NAME FOR THE RECORD AND

17 || SPELL YOUR LAST NAME FOR THE REPORTER.

18 ||         THE WITNESS:  LORI JEAN BUTTS, B-U-T-T-S.

19 ||         THE COURT:  THANK YOU VERY MUCH.

20 ||         YOU MAY PROCEED.

21 ||         MR. STICKNEY:  YOUR HONOR, AS YOU HAVE ALREADY

22 || INDICATED THERE ARE MEDIA HERE IN THE COURTROOM.  MUCH OF WHAT

23 || MISS BUTTS IS GOING TO REPORT IS GOING TO DEAL WITH MY CLIENT'S

24 || FAMILY, AND I WOULD ASK THAT THEY RESPECT AS MUCH OF HER

25 || PRIVACY AND HER FAMILY'S PRIVACY AS POSSIBLE IN REPORTING THIS.

```
 1           THE COURT:  WELL, I HAVE NO CONTROL OVER THAT.

 2           MR. STICKNEY:  YES, YOUR HONOR.  I AM BASICALLY ASKING

 3   THEM TO DO THAT.

 4           THE COURT:  OKAY.

 5           MR. STICKNEY:  THANK YOU.

 6           MY CLIENT HAS WAIVED HER RIGHT TO MAINTAIN THE PRIVACY

 7   OF HER MEDICAL INFORMATION.  I HAVE SPOKEN TO HER FAMILY AND

 8   THEY AGREED TO ALLOW MISS BUTTS TO SPEAK ABOUT THEIR

 9   INVOLVEMENT AS WELL.

10                     DR. LORI JEAN BUTTS,

11   BEING DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

12                      DIRECT EXAMINATION

13   BY MR. STICKNEY:

14   Q.  MA'AM, WHAT'S YOUR PROFESSION?

15   A.  I AM A LICENSED CLINICAL PSYCHOLOGIST.

16   Q.  AND YOUR EDUCATIONAL BACKGROUND?

17   A.  I HAVE AN UNDERGRADUATE DEGREE IN PSYCHOLOGY FROM CLEMSON

18   UNIVERSITY WHERE I GRADUATED IN THE HONORS PROGRAM THERE.  FROM

19   THERE I WENT TO A JOINT DEGREE PROGRAM IN BOTH LAW AND

20   PSYCHOLOGY AT VILLANOVA SCHOOL OF LAW AND AT THE TIME IT WAS

21   NCP HONIMAN UNIVERSITY.  BY THE TIME I GRADUATED IT WAS BOUGHT

22   BY DREXEL UNIVERSITY.  SO I HAVE A PH.D. IN CLINICAL PSYCHOLOGY

23   FROM JACKSON UNIVERSITY AND A J.D. FROM VILLINOVA.  I'M A

24   LICENSED PSYCHOLOGIST IN THE STATE OF FLORIDA AND THE STATE OF

25   COLORADO, AND I'M A LICENSED ATTORNEY IN THE STATE OF FLORIDA
```

1  AS WELL.

2  Q.  WHERE DO YOU WORK?

3  A.  AT THE CLINICAL AND FORENSIC INSTITUTE.

4  Q.  CAN YOU MOVE A LITTLE BIT CLOSER TO THE MICROPHONE, PLEASE,

5  SO THE COURT REPORTER CAN TAKE DOWN EVERYTHING YOU'RE SAYING.

6      HAVE YOU TESTIFIED AS AN EXPERT WITNESS IN FORENSIC

7  PSYCHOLOGY?

8  A.  YES, I HAVE.

9  Q.  HAVE YOU BEEN CERTIFIED AS AN EXPERT IN FEDERAL COURT?

10  A.  YES, I HAVE.

11  Q.  IN THIS DISTRICT OR OTHER DISTRICTS?

12  A.  BOTH.

13  Q.  WOULD YOU TELL THE COURT HOW YOU KNOW MISS VILLEGAS,

14  PLEASE.

15  A.  I MET HER INITIALLY -- HER ATTORNEY HIRED ME TO DO A

16  FORENSIC EVALUATION OF HER IN NOVEMBER OF 2009.  THE QUESTIONS

17  WERE TO DETERMINE HER MENTAL STATE AT THE TIME OF THE OFFENSE.

18  Q.  DID YOU ACTUALLY CONDUCT A PSYCHOLOGICAL TEST ON MY CLIENT?

19  A.  YES, I -- OVER THREE DAYS I CONDUCTED NUMEROUS

20  PSYCHOLOGICAL TESTS, INTERVIEWING, AND COLLATERAL INFORMATION

21  GATHERING.

22  Q.  WHAT DID YOU CONCLUDE FROM THOSE TESTS?

23  A.  IT WAS MY FORENSIC OPINION THAT HER MENTAL STATE AT THE

24  TIME OF THE OFFENSE WAS IMPACTED BY HER HISTORY OF TRAUMA

25  DATING BACK TO WHEN SHE WAS A CHILD.  THAT SHE WAS SUFFERING

1   FROM POST-TRAUMATIC STRESS DISORDER, AND SHE -- WELL,

2   MISS VILLEGAS HAS NEVER ONCE MADE AN EXCUSE FOR HER BEHAVIOR.

3           THIS IS MY PSYCHOLOGICAL INTERPRETATION IN WHAT I'M

4   DOING.  I WANT TO MAKE THAT CLEAR.  WAS THAT SHE -- SHE

5   HONESTLY BELIEVED THAT MR. ROTHSTEIN WOULD BE KILLED IF SHE DID

6   NOT HELP HIM.  AND THIS IS -- I'M JUMPING FORWARD.  THIS IS AT

7   THE END OF THE TIME WHERE ABOUT A YEAR PREVIOUSLY MR. ROTHSTEIN

8   HAD BEEN THE SUPPORT, HE AND MELISSA BRITT LEWIS WERE THE

9   SUPPORT OF MISS VILLEGAS TO GET HER OUT OF A 17-YEAR EXTREMELY

10  ABUSIVE RELATIONSHIP.

11  Q.  THE MOST IMPORTANT TRAUMATIC EVENTS IN HER LIFE WOULD BE

12  WHAT?

13  A.  THERE ARE VERY NUMEROUS.

14  Q.  WELL, WOULD YOU CATEGORIZE THE JUVENILE, THE YOUNG ADULT,

15  AND WHAT SHE'S RECENTLY EXPERIENCED.

16  A.  WELL, THEY BUILD UPON EACH OTHER, AND THIS IS WHAT WE SEE

17  WITH VICTIMS.  THEY GET REVICTIMIZED AND RETRAUMATIZED OVER

18  THEIR SPAN OF THEIR LIFETIME.

19          SHE WAS RAISED BY A MOTHER WHO WAS AN ALCOHOLIC, SHE

20  WAS SEXUALLY ABUSED BY ONE OF HER MOTHER'S BOYFRIENDS.  THEY

21  LIVED IN 52 DIFFERENT HOMES.  SO AT THE AGE OF 14 MISS VILLEGAS

22  LEFT AND LIVED IN A TRUCK AND WENT TO HIGH SCHOOL ON HER OWN

23  AND LIVED -- HAD -- GOT A LICENSE IN TEXAS, A HARDSHIP LICENSE.

24  SHE LIVED OUT OF HER TRUCK, CONTINUED TO GO TO HIGH SCHOOL,

25  WORKED IN A BAR.  AT AGE 15 OR 16 SHE WAS ABDUCTED AT THE BAR,

```
 1  AND -- BY TWO OF THE PATRONS OF THE BAR AND TAKEN TO A FIELD
 2  AND RAPED.  THE POLICE REALLY THEY SAW THAT SHE HAD BEEN HURT
 3  AND REALLY HAD NO INTEREST IN PROSECUTING HER CASE.
 4  Q.  SO THAT CASE WAS NOT PROSECUTED.
 5  A.  ABSOLUTELY NOT.
 6  Q.  DID SHE EVER MISS A DAY OF SCHOOL IN HER LIFE?
 7  A.  NO, SHE DID NOT.
 8  Q.  LIVING IN THE BACK OF THE TRUCK?
 9  A.  NO.  SHE NEVER MISSED A DAY OF SCHOOL.  NEVER MISSED A DAY
10  OF WORK EITHER.  SHE WENT TO WORK THE NEXT DAY.
11  Q.  WHAT OTHER TRAUMA DID SHE EXPERIENCE IN HER LIFE?
12  A.  FROM THAT PERIOD OF TIME, THAT DEVELOPMENTAL PERIOD THROUGH
13  CHILDHOOD AND ADOLESCENT SHE LEARNED HOW TO SURVIVE OBVIOUSLY
14  AND KEEP EVERYTHING IN AND SHE NEVER TURNED TO ANYONE FOR HELP.
15        SHE WAS A HARD WORKER, SHE WAS LOYAL.  AND THEN SHE
16  GOT INVOLVED IN A RELATIONSHIP WITH TONY VILLEGAS, WHO SHE
17  MARRIED AND WAS WITH FOR 17 YEARS.  DURING THE COURSE OF THAT
18  RELATIONSHIP HE WAS EXTREMELY ABUSIVE TO THE CHILDREN, HE
19  THREATENED HER LIFE ON NUMEROUS OCCASIONS.  SHE NEVER ONCE
20  FILED A POLICE REPORT, SHE NEVER ONCE DID ANYTHING BECAUSE AS
21  SHE LEARNED THROUGHOUT HER LIFE SHE WAS -- SHE FELT POWERLESS
22  AND SHE FELT THAT THE PATH OF LEASE RESISTANCE WAS TO GRIN AND
23  BEAR IT, PUT HER HEAD DOWN AND CONTINUE ON AND JUST SURVIVE.
24  Q.  IN FACT, WHEN SHE WAS MARRIED TO MR. VILLEGAS DID HE FORCE
25  HER CHILDREN TO SLEEP IN THE DOG'S CRATE?
```

1  A.  YES, SHE DID.

2  Q.  HOW DID MISS VILLEGAS RESOLVE THAT ISSUE?

3  A.  SHE WENT INTO THE DOG CRATE WITH THE CHILD AND SAID THAT

4  SHE WAS NOT GOING TO LEAVE THE DOG CRATE UNTIL THE CHILD WAS

5  REMOVED.

6  Q.  SHE DID NOT REPORT THE ABUSE TO THE POLICE.

7  A.  NO.  THERE IS SO MANY INSTANCES OF ABUSE IT'S -- HE -- SHE

8  WOULD COME HOME AND THE CHILDREN WOULD HAVE ELECTRICAL CORD

9  MARKS ON THE BACKS OF THEIR LEGS.  I CAN GO ON.  I'M TRYING TO

10  PROTECT THEIR PRIVACY.

11  Q.  DID SHE EVENTUALLY -- DID MR. ROTHSTEIN FIND OUT THAT SHE

12  WAS HAVING MARITAL PROBLEMS?

13  A.  YES.

14  Q.  AND DID HE ASSIST HER TO EXTRICATE HERSELF FROM THOSE

15  PROBLEMS?

16  A.  YES, HE DID.

17  Q.  WHAT DID HE DO FOR HER?

18  A.  HE AND MISS LEWIS BOTH TALKED TO MISS VILLEGAS, TOLD HER

19  THAT THEY WOULD SUPPORT HER, THAT THEY WOULD BE HER SAFETY NET

20  SO THAT SHE COULD GET AWAY FROM MR. VILLEGAS.  THEY TOLD HER

21  THAT THEY WOULD KNOW THAT SHE WOULD BE SAFE AT ALL TIMES, THAT

22  THERE WAS NO WAY HE WAS GOING TO KILL HER OR HER FAMILY BECAUSE

23  IF HE WOULD HAVE HE WOULD HAVE DONE IT ALREADY AND HE WAS A

24  COWARD.

25         THAT'S WHAT MR. ROTHSTEIN IMPARTED TO MISS VILLEGAS

```
 1   AFTER MISS -- MISS VILLEGAS AND MR. ROTHSTEIN HAD KNOWN EACH
 2   OTHER AND BEEN CLOSE FOR 17 YEARS, AND SHE DECIDED TO TRUST
 3   MR. ROTHSTEIN'S JUDGMENT IN THIS AREA.  TO THIS DAY SHE FEELS
 4   EXTREMELY HORRIBLE THAT SHE BELIEVED IN THAT BECAUSE AFTER SHE
 5   LEFT MR. VILLEGAS HE KILLED HER BEST FRIEND.
 6   Q.  WELL, FIRST DID MY CLIENT HAVE A TRUE FEAR THAT SHE WOULD
 7   BE KILLED BY HER HUSBAND?
 8   A.  IT WASN'T JUST A FEAR.  SHE KNEW.  SHE KNEW HE WAS GOING TO
 9   KILL HER.
10   Q.  AND SHE LEFT HIM.
11   A.  YES.
12   Q.  WITH MR. ROTHSTEIN'S HELP.
13   A.  YES.
14   Q.  AND THEN WHAT HAPPENED TO MISS VILLEGAS
15           THE COURT:  EXCUSE ME FOR JUST A MINUTE.
16           MISS BUTTS, COULD YOU GIVE ME A TIME LINE?  FOR
17   EXAMPLE, IF YOU KNOW, APPROXIMATELY WHEN DID MR. ROTHSTEIN
18   AND/OR MISS LEWIS APPROACH THE DEFENDANT ABOUT HELPING HER IN
19   HER MARITAL SITUATION, IF YOU KNOW.
20           THE WITNESS:  I DO KNOW.  I JUST NEED TO LOOK AT MY
21   NOTES, YOUR HONOR.
22           THE COURT:  SURE.  GO RIGHT AHEAD.
23           THE WITNESS:  IN JANUARY OF 2007 MISS VILLEGAS TURNED
24   TO SCOTT AND MELISSA LEWIS WHO HAD KNOWN HER THIS WHOLE TIME
25   AND THEY DID NOT KNOW SHE WAS IN AN ABUSIVE RELATIONSHIP, THEY
```

```
 1   DID NOT KNOW ABOUT THIS.  SO SHE TURNED TO THEM, AND AT THAT
 2   POINT IN TIME IN JANUARY OF 2007 THEY RALLIED AROUND HER TO
 3   GIVE HER SUPPORT TO HELP HER TRY TO GET AWAY FROM HIM.
 4              THE COURT:  OKAY.  THANK YOU.
 5              THE WITNESS:  AND ON FEBRUARY 14, 2007, SHE TOLD
 6   MR. VILLEGAS SHE WANTED A DIVORCE.  FROM FEBRUARY 2007 UNTIL
 7   JANUARY 2008, MR. VILLEGAS CONTINUED TO STALK -- MR. VILLEGAS
 8   CONTINUED TO STALK MRS. VILLEGAS.  HIS CAR WOULD BE DOWN THE
 9   STREET.  WHEREVER SHE WENT SHE WOULD SEE HIS CAR.  SHE WAS
10   SLEEPING IN HER BED WHEN HE WAS NOT PERMITTED TO BE IN THE HOME
11   AND WAKE UP AND HE WOULD BE STANDING OVER HER LAUGHING.
12   BY MR. STICKNEY:
13   Q.  IN MARCH OF 2008 WAS THERE ANOTHER TRAUMATIC EVENT?
14   A.  THAT'S WHEN MR. VILLEGAS KILLED MELISSA BRITT LEWIS.
15   Q.  THAT'S WHAT MY CLIENT BELIEVES, IS THAT CORRECT?
16   A.  YES, SIR.
17              THE COURT:  I AM SORRY.  SAY THAT AGAIN?
18   BY  MR. STICKNEY:
19   Q.  THAT'S WHAT MISS VILLEGAS, MY CLIENT, BELIEVES.
20   A.  HE HAS NOT BEEN FOUND GUILTY OF THE CRIME YET.  HE IS
21   AWAITING TRIAL.
22   Q.  AND THE --
23   A.  AND MELISSA LEWIS --
24   Q.  DURING THIS PERIOD OF TIME WHEN MR. ROTHSTEIN WAS ASSISTING
25   MY CLIENT THROUGH HER DIVORCE AND SEPARATION, DID SHE DEVELOP
```

1  EVEN MORE INTENSE FEELINGS OF LOYALTY TOWARDS HIM?

2  A.  ABSOLUTELY.  SHE FELT LIKE MR. ROTHSTEIN SAVED HER LIFE AND

3  THE LIVES OF HER CHILDREN.  SHE BELIEVED THAT -- SHE BELIEVES

4  THAT TO THIS DAY, UNFORTUNATELY AT THE EXPENSE OF MISS BRITT

5  LEWIS.

6  Q.  YOU ARE A FORENSIC PSYCHOLOGIST.  DO YOU HAVE AN OPINION AS

7  TO WHY MISS LEWIS WAS THE VICTIM INSTEAD OF MISS VILLEGAS?

8  A.  BECAUSE IT'S MORE INSIDIOUS.  IT'S MORE HARMFUL TO

9  MISS VILLEGAS TO HAVE TO LIVE THE REST OF HER LIFE WITH THE

10  GUILT TO KNOW THAT SHE IS PARTLY RESPONSIBLE FOR THE DEATH OF

11  HER BEST FRIEND AND WHO -- THE WOMAN WHO THEIR CHILDREN VIEWED

12  AS THEIR AUNT.

13  Q.  SHE IS NOT THE ONLY ONE LIVING WITH THIS GUILT.  HAVE YOU

14  INTERVIEWED HER CHILDREN?

15  A.  YES.

16  Q.  HAVE YOU INTERVIEWED ISAIAH VILLEGAS?

17  A.  YES.

18  Q.  HOW OLD IS HE?

19  A.  HE IS 13.

20  Q.  HOW DOES THIS -- THE DEATH OF MELISSA PLAY TO HIS

21  PSYCHOLOGY AND WHAT HAPPENED TO HIM?

22  A.  HE HAS -- HE HAS ADHD, AND AS A RESULT OF THE TRAUMA OF

23  BEING ABUSED AND OF THE DEATH OF MISS LEWIS HE HAS PTSD.  AFTER

24  HER MURDER --

25  Q.  WELL, LET'S SAY BEFORE HER MURDER, IF I COULD INTERRUPT,

 1 | WAS HE ATTACHED TO MISS BRITT LEWIS?

 2 | A.  OH, ABSOLUTELY.

 3 | Q.  EXPLAIN TO THE COURT THAT RELATIONSHIP.

 4 | A.  THEY WERE SO CLOSE.  SHE WAS SO NURTURING AND SO CLOSE TO

 5 | ISAIAH.  YOU KNOW, HE CALLED HER HIS AUNT AND HE WAS LIKE A --

 6 | HE FOLLOWED HER AROUND LIKE HER SHADOW HE WAS SO CLOSE TO HER.

 7 | HE STILL WEARS A BELT THAT HAS HER NAME ON IT TO THIS DAY.

 8 | Q.  HE WAS ELEVEN AT THE TIME OF HER DEATH?

 9 | A.  YES, HE WAS.

10 | Q.  DID MR. VILLEGAS, ISAIAH'S FATHER, ASKED ISAIAH TO MOVE IN

11 | TO LIVE WITH HIM PRIOR TO MELISSA'S DEATH, DO YOU KNOW?

12 | A.  I DON'T KNOW ABOUT THAT.  BUT WHEN HE AND HIS BROTHER WENT

13 | TO VISITATIONS WITH MR. VILLEGAS THEY WERE GRILLED ABOUT WHAT

14 | MISS VILLEGAS WAS DOING AND ABOUT WHAT MELISSA WAS DOING, AND

15 | THE KIDS DIDN'T KNOW WHAT WAS -- WHY THOSE QUESTIONS WERE BEING

16 | ASKED.  BUT MR. VILLEGAS WAS CONSTANTLY ASKING THEM ABOUT THE

17 | WHEREABOUTS, THE COMINGS AND GOINGS, AND THE BEHAVIORS OF

18 | MISS VILLEGAS AND MISS LEWIS.

19 | Q.  AND WHEN YOU SAY "VISITATIONS" YOU MEAN VISITATIONS FOR

20 | FAMILY VISITS AS PART OF THE SEPARATION.

21 | A.  YES, SIR.

22 | Q.  BECAUSE HE IS INCARCERATED NOW, CORRECT?

23 | A.  RIGHT.  AND THEY NO LONGER SEE HIM AND THEY ARE SCARED.

24 | Q.  DO YOU KNOW WHETHER ISAIAH FEELS GUILTY FOR MISS LEWIS'

25 | DEATH?

1  A.  ABSOLUTELY.

2  Q.  CAN YOU EXPLAIN WHY THAT IS.

3  A.  HE ATTEMPTED TO HARM HIMSELF SOON AFTER HER MURDER, AND

4  MR. ROTHSTEIN WAS INTEGRAL IN HELPING MISS VILLEGAS FIND A

5  THERAPEUTIC RESIDENTIAL BOARDING SCHOOL FOR HIM AFTER HE WAS

6  DEMONSTRATED SELF-INJURIOUS BEHAVIOR, AND HE STAYED THERE AND

7  HE THRIVED THERE, AND UNFORTUNATELY WITH THE -- THIS INCIDENT

8  THERE WAS NO LONGER THE FUNDING TO KEEP HIM THERE AND HE HAD TO

9  COME HOME.

10  Q.  HOW MANY TIMES DID YOU MEET WITH MISS VILLEGAS SINCE

11  NOVEMBER 2009?

12  A.  I DIDN'T SEE HER AFTER MY INITIAL EVALUATION, AND THEN I'VE

13  GOT A PHONE CALL FROM HER ATTORNEY ON DECEMBER --

14  Q.  JUST HOW MANY TIMES DID YOU SEE HER.  THAT'S OKAY.

15  A.  THERE HAS BEEN -- FIRST IT WAS EVERY DAY FOR SEVERAL

16  MONTHS, THEN IT WENT TO A FEW TIMES A WEEK.  NOW IT'S ONCE A

17  WEEK BECAUSE SHE LIVES IN CLEWISTON AND WE TALK ON THE PHONE

18  INTERMITTENTLY.  SO THERE IS I WOULD SAY MAYBE 300 HOURS.

19  Q.  SHE HAS BENEFITED FROM YOUR TREATMENT THEN?

20  A.  YES, SHE HAS.

21  Q.  AND, THEREFORE, YOU DON'T NEED TO SEE HER AS MUCH?

22  A.  NO.  IF SHE LIVED CLOSER I WOULD SEE HER MORE OFTEN STILL.

23  SHE IS -- SHE DOES NOT GET OUT OF THE BED, SHE DOESN'T SLEEP,

24  SHE'S STILL HAS MANY PSYCHIATRIC SYMPTOMS.

25  Q.  WOULD SHE CONTINUE TO BENEFIT FROM YOUR TREATMENT?

1  A.  ABSOLUTELY.  SHE NEEDS IT.

2  Q.  YOU HAVE STATED THAT SHE DOESN'T TRUST PEOPLE GENERALLY

3  BECAUSE OF HER UPBRINGING.  DOES SHE TRUST YOU?

4  A.  YES.

5  Q.  HAS SHE EVER SOUGHT PSYCHIATRIC TREATMENT FROM ANY OTHER

6  DOCTOR?

7  A.  MR. ROTHSTEIN HAD SENT HER AFTER MISS BRITT LEWIS' MURDER

8  TO SOMEBODY, BUT MISS VILLEGAS WENT TO APPEASE MR. ROTHSTEIN

9  AND NEVER SPOKE ABOUT ANYTHING PERSONAL.  IT WAS JUST ALL

10  SUPERFICIAL DISCUSSIONS.

11  Q.  TO YOUR KNOWLEDGE, ARE YOU THE FIRST DOCTOR THAT'S BEEN

12  ABLE TO BREAK HER OR TO ENTER HER WORLD AND ACHIEVE HER TRUST?

13  A.  YES, I AM.

14  Q.  DO YOU THINK THAT WOULD BE EASY TO DO FOR ANOTHER DOCTOR?

15  A.  ABSOLUTELY NOT.  IT WOULD BE INSURMOUNTABLE.

16  Q.  DURING YOUR MEETINGS WITH MY CLIENT DID SHE EVER DENY HER

17  INVOLVEMENT TO THE OFFENSE TO WHICH SHE HAS PLED GUILTY?

18  A.  NO, SIR.

19  Q.  YOU ARE A LAWYER AS WELL.  YOU UNDERSTAND THE EVENTS OF

20  MONEY -- WELL, OF MONEY LAUNDERING CONSPIRACY THAT SHE HAS PLED

21  GUILTY TO.

22  A.  YES, I DO.

23  Q.  DID MY CLIENT EVER BLAME ANYBODY ELSE FOR HER OWN CRIMINAL

24  ACTIVITY?

25  A.  ABSOLUTELY NOT.  WITH THE CAVEAT THAT AT THE BEGINNING OF

 1 | WHEN SHE -- BEFORE MELISSA'S DEATH SHE DIDN'T KNOW.  AFTER
 2 | MELISSA'S DEATH FOR A PERIOD OF TIME SHE DIDN'T KNOW WHAT SHE
 3 | WAS DOING.  SHE WAS JUST DOING WHAT MR. ROTHSTEIN TOLD HER TO
 4 | DO.  SHE DIDN'T -- SHE NEVER KNEW UNTIL THE INVESTIGATION THAT
 5 | THERE WAS -- SHE DIDN'T EVEN KNOW WHAT A PONZI SCHEME WAS.
 6 |          SO WITH THE CAVEAT IS, SHE KNEW SHE WAS DOING
 7 | SOMETHING WRONG, SHE DIDN'T KNOW WHAT THE IMPLICATIONS WERE.
 8 | SHE DIDN'T ASK, SHE DID WHAT SHE WAS TOLD.
 9 | Q.  AND SHE KNEW BY SIGNING PEOPLES' NAMES WHEN SHE WAS NOT
10 | THAT PERSON THAT SHE WAS FORGING PEOPLES' NAMES, RIGHT?
11 | A.  CORRECT.
12 | Q.  SO WHAT YOU'RE SAYING IS SHE DIDN'T -- IF I CAN
13 | RECHARACTERIZE IT, SHE DIDN'T UNDERSTAND THE FULL EXTENT OF
14 | ROTHSTEIN'S CRIME.
15 | A.  EXACTLY.
16 | Q.  BUT SHE KNEW SHE WAS HERSELF COMMITTING A CRIME BY HER
17 | ACTIVITY, RIGHT?
18 | A.  YES, SIR.  SHE DIDN'T KNOW WHAT CRIME IT WAS.
19 | Q.  DID SHE PRESUME THAT IT WAS MONEY LAUNDERING?
20 | A.  AFTER A PERIOD OF TIME I WOULD SAY ABOUT FOUR, FIVE MONTHS
21 | INTO IT, IT STARTED -- SHE SAID IT STARTED KIND OF CLICKING
22 | WITH HER BUT SHE NEVER VOICED THAT, NEVER ASKED ABOUT IT.  IT
23 | JUST -- THAT'S WHAT SHE DEDUCED FROM WHAT SHE WAS SEEING GOING
24 | ON.
25 | Q.  AND SHE DEDUCED INCORRECTLY BECAUSE IT WAS ACTUALLY A PONZI

 1  SCHEME AND NOT MONEY LAUNDERING.

 2  A.   RIGHT.

 3  Q.   AND FOR THE NEXT YEAR AND A HALF SHE WILLFULLY PARTICIPATED

 4  IN THAT OFFENSE, CORRECT?

 5  A.   CORRECT.  BUT WHEN YOU SAY "WILLFUL" I MEAN SHE -- YES, SHE

 6  HAD A CHOICE, BUT SHE WAS -- SHE WAS VERY LOYAL.  SHE WAS VERY

 7  LOYAL TO MR. ROTHSTEIN AND BELIEVED THAT HIS LIFE WAS IN

 8  JEOPARDY.

 9  Q.   AS YOU'VE STATED EARLIER BECAUSE --

10  A.   BECAUSE SHE BELIEVED THAT THERE WAS A MAFIA INVOLVEMENT,

11  WHICH WE NOW KNOW IS BASED IN REALTY.  SHE BELIEVED THAT --

12  THAT SOMEBODY WAS GOING TO KILL HIM, AND SHE BELIEVED THAT

13  SINCE HE SAVED HER AND HER FAMILY'S LIVES FROM A CREDIBLE REAL

14  TREAT OF DEATH --

15  Q.   FROM VILLEGAS

16  A.   YES.

17  Q.   FROM TONY VILLEGAS

18  A.   YES.  THAT SHE OWED IT TO MR. ROTHSTEIN TO PROTECT HIM AS

19  WELL.

20       THE COURT:  BUT, MISS, BUTTS YOU ARE NOT SAYING THAT

21  LOYALTY EXCUSES CRIMINAL ACTIVITY, ARE YOU?

22       THE WITNESS:  NO, SIR.  NO, SIR.  I'M JUST -- I'M JUST

23  EXPLAINING WHAT WAS GOING ON.

24       THE COURT:  ALL RIGHT.

25  BY MR. STICKNEY:

1    Q.   AND MY CLIENT NEVER MADE EXCUSES FOR HER ACTIONS.

2    A.   NOT ONCE.

3    Q.   THIS IS YOUR ASSESSMENT OF YOUR REVIEW OF THE FACTS.

4    A.   YES, SIR.

5    Q.   WAS THERE ANY INDICATION TO YOU WHILE YOU WERE INTERVIEWING

6    MY CLIENT DURING YOUR TREATMENTS THAT SHE COMMITTED THIS

7    OFFENSE FOR HER OWN PERSONAL FINANCIAL GAIN?

8    A.   ABSOLUTELY NOT.

9    Q.   DO YOU KNOW THAT MR. ROTHSTEIN GAVE HER A HOUSE?

10   A.   YES, HE DID.

11   Q.   DO YOU KNOW WHY THAT WAS?

12   A.   YES.  BECAUSE HE WANTED TO GIVE HER FAMILY A NEW START

13   AFTER THE MURDER.  SHE WANTED TO GIVE RENT TO HIM, HE WOULDN'T

14   TAKE THE CHECK.  SHE PAID TAXES ON IT, AND THEN ONE DAY HE TOLD

15   SOMEBODY TO PUT THE TITLE IN HER NAME AND SHE ASKED HIM NOT TO

16   DO THAT, FELT UNCOMFORTABLE ABOUT IT, BUT HE DID WHATEVER IT IS

17   THAT HE WANTED TO DO.  SHE WAS VERY GRATEFUL FOR IT, AND IT

18   HELPED HER FAMILY TRY TO START OVER.

19   Q.   DID HE ALSO PURCHASE A VEHICLE FOR HER?

20   A.   YES.  HE DID.

21   Q.   A MASERATI.

22   A.   YES.

23   Q.   DID SHE WANT THAT GIFT?

24   A.   ABSOLUTELY NOT.  SHE WAS EMBARRASSED.

25   Q.   SHE DROVE IT FOR A TIME, IS THAT BECAUSE -- WHY WAS THAT?

```
 1  A.  TO APPEASE HIM BECAUSE HE ASKED HER TO.

 2  Q.  MR. ROTHSTEIN.

 3  A.  YES.

 4  Q.  AND HE WAS HER BOSS AT THE TIME.  HE BASICALLY ORDERED HER

 5  TO DRIVE IT?

 6  A.  HE TOLD HER TO DRIVE IT TO A PARTY, AND THEN SHE DIDN'T

 7  WANT TO APPEAR UNGRATEFUL SO AT CERTAIN TIMES WHEN HE -- SHE

 8  KNEW THAT HE WOULD KNOW THAT SHE WOULD DRIVE IT SHE WOULD DO IT

 9  TO MAKE HIM HAPPY.

10  Q.  WHEN DID SHE STOP DRIVING THE MASERATI?

11  A.  OH.

12  Q.  WHAT EVENT OCCURRED, IF YOU KNOW.

13  A.  SHE STOPPED -- I'M NOT SURE WHAT YOU'RE ASKING ME.  SHE

14  STOPPED DRIVING IT BEFORE THIS ALL HAPPENED.  SHE PREFERS A

15  PICKUP TRUCK.

16  Q.  MISS VILLEGAS HAS TWO SONS, WE'VE BEEN TALKING ABOUT

17  ISAIAH.  SHE ALSO HAS A SON NAMED CALEB.  CAN YOU -- DID YOU

18  MEET WITH CALEB?

19  A.  YES, SIR.

20  Q.  DID YOU DO A DIAGNOSIS AND ASSESSMENT ON CALEB?

21  A.  YES.

22  Q.  AND WHAT DID YOU DO DEDUCE FROM THAT?

23  A.  HE HAS ASPERGER'S DISORDER, UNTREATED --

24  Q.  HOW DO YOU SPELL THAT?

25  A.  ASPERGER APOSTROPHE S.
```

```
 1              -- POST-TRAUMATIC STRESS DISORDER AND MAJOR
 2  DEPRESSION.
 3  Q.  CAN YOU EXPLAIN BRIEFLY WHAT ASPERGER'S DISORDER IS?
 4  A.  SURE.  IT'S A PERVASIVE DEVELOPMENTAL DISORDER WHERE
 5  SOMEBODY HAS A DIFFICULT TIME UNDERSTANDING SOCIAL CONTEXT AND
 6  SOCIAL NUANCES WITHIN INTERPERSONAL COMMUNICATION.
 7              AT AN EARLY AGE HE WAS DEVELOPING NOT AS A NORMAL
 8  CHILD, AND MISS VILLEGAS WANTED HIM TO GET TESTED AND TOOK HIM
 9  TO THE DAN MORENO CENTER FOR ONE APPOINTMENT AND MR. VILLEGAS
10  FORBAD HER TO CONTINUE THE ASSESSMENT BECAUSE HE SAID THAT
11  THERE IS NOTHING WRONG WITH HIS SON.  AND SO, THEREFORE, CALEB
12  NEVER TO THIS DAY HAS RECEIVED TREATMENT FOR SOMETHING THAT
13  COULD HAVE BEEN TREATED HIS ENTIRE LIFE.
14  Q.  DO THE CHILDREN BENEFIT FROM THEIR MOTHER'S PRESENCE?
15  A.  ABSOLUTELY.
16  Q.  WHAT --
17  A.  THEY DEPEND ON IT.
18  Q.  I'M SORRY?
19  A.  THEY DEPEND ON IT.
20  Q.  HOW MANY YEARS HAVE YOU BEEN PRACTICING CLINICAL AND
21  FORENSIC PSYCHOLOGY?
22  A.  ABOUT 1O YEARS.
23  Q.  HOW MANY TIMES HAVE YOU DIAGNOSED, IF YOU CAN ESTIMATE,
24  PTSD IN YOUR PATIENTS?
25  A.  I DEAL WITH SURVIVORS OF SEXUAL ABUSE.  SO -- AND
```

```
 1  PERPETRATORS OF SEXUAL ABUSE.  SO MANY TIMES.
 2  Q.  IN FACT, YOU HAVE TESTIFIED FOR BOTH THE GOVERNMENT, THE
 3  UNITED STATES GOVERNMENT, THE STATE ATTORNEY'S OFFICE, AS WELL
 4  AS DEFENSE ATTORNEYS, CORRECT?
 5  A.  OH, YES, SIR.  YES, SIR.
 6  Q.  JUST IN GENERAL SO THE COURT UNDERSTANDS, YOU TESTIFY MORE
 7  FOR ONE THE OTHER OR IS IT EQUAL?
 8  A.  NO.  NO, SIR.  IT'S EQUAL.
 9  Q.  IS IT POSSIBLE TO RANK THE SEVERITY OF PTSD IN PATIENTS?
10  A.  IT'S POSSIBLE ABOUT THE SEVERITY OF THEIR SYMPTOMS, YES.
11  AND MISS VILLEGAS' POST-TRAUMATIC STRESS DISORDER IS THE WORST
12  THAT I HAVE EVER SEEN OUTSIDE OF A HOSPITAL.
13  Q.  SO ANYBODY THAT YOU HAVE SEEN WITH WORST PTSD IS
14  HOSPITALIZED.
15  A.  YES, SIR.  FOR AN EXTENDED PERIOD OF TIME.
16  Q.  DID YOU, IN FACT, RECOMMEND HOSPITALIZATION FOR
17  MISS VILLEGAS
18  A.  YES, I DID.
19  Q.  AND DID SHE ALLOW YOU TO HOSPITALIZE HER?
20  A.  NO, SHE DID NOT.
21  Q.  WHY NOT?
22  A.  BECAUSE SHE SAID HER CHILDREN COULDN'T SURVIVE WITHOUT HER
23  PRESENCE, WITHOUT HER BEING IN THE HOUSEHOLD, AND THAT SHE
24  WOULDN'T TALK TO ANYBODY IF SHE WERE IN THE HOSPITAL ANYWAY.
25  SO IT SEEMED COUNTERPRODUCTIVE, IT SEEMED MORE TRAUMATIC.  SHE
```

1   COMPLETELY BROKE DOWN EVEN MORE SO.

2           AND, SO I SAID, "OKAY.  WELL, WE ARE GOING TO MAKE A

3   PACK THAT I'M GOING TO SEE YOU EVERY SINGLE DAY," AND SHE HELD

4   UP TO THAT.  AND SHE WENT AND I -- I HAD HER GO SEE A

5   PSYCHIATRIST, AND SHE WENT TO A PSYCHIATRIST AND SHE RECEIVED

6   PSYCHIATRIC MEDICATION AS WELL WHICH SHE STILL TAKES.

7   Q.  IT DOESN'T AFFECT HER UNDERSTANDING OF THE EVENTS GOING ON

8   TODAY, DOES IT?

9   A.  NO, SIR.  IT HELPS HER ACTUALLY STAY FOCUS ON BEING ABLE TO

10  BE HERE TODAY.

11  Q.  AND IN YOUR MEDICAL OPINION AS A CLINICAL AND FORENSIC

12  PSYCHOLOGIST, WOULD THE CHILDREN BE ABLE TO -- WHAT WOULD

13  HAPPEN TO THE CHILDREN IF MY CLIENT WAS INCARCERATED?

14  A.  THEY WOULDN'T SURVIVE, LITERALLY WOULD NOT SURVIVE.  THEY

15  ARE FACING BEING WITNESSES IN THEIR FATHER'S MURDER CASE.  THEY

16  ARE SCARED TO DEATH TO SEE HIM.  THEY ARE LISTED WITNESSES,

17  HAVE YET TO BE DEPOSED.  THEY WILL NOT ENDURE THAT, NOR TRIAL,

18  NOR THE POSSIBILITY IF THEIR FATHER EVER GETS ANYTHING LESS

19  THAN LIFE WITHOUT PAROLE.  THEY ARE TERRIFIED.

20  Q.  AND YOU SAID THEY LITERALLY WOULD NOT SURVIVE.  YOU ARE

21  NOT --

22  A.  I AM NOT EXAGGERATING ON THAT.

23  Q.  THAT'S WITHOUT THEIR MOTHER BEING PRESENT.

24  A.  CORRECT.

25  Q.  IF THEIR MOTHER WAS PRESENT WOULD THEY BE ABLE TO SURVIVE?

 1  A.  YES.  YES.  SHE WOULD BE ABLE TO GIVE THEM THE SPORT AND

 2  THEY WOULD BE ABLE TO GET THROUGH.  IT STILL WOULD BE

 3  EXCEEDINGLY TRAUMATIC FOR THEM, BUT SHE WOULD BE ABLE TO GIVE

 4  THEM THE RESOURCES, THE NURTURE, AND SUPPORT THAT THEY SO

 5  DESPERATELY NEED TO MAKE IT THROUGH THIS.

 6          THE COURT:  MISS BUTTS, WHAT I'M TRYING TO GET A

 7  HANDLE ON WITH RESPECT TO YOUR TESTIMONY ABOUT THE CHILDREN.

 8          HAS THIS BEEN THE SITUATION FOR THE LIFETIME OF THE

 9  CHILDREN THAT THEY HAVE ALWAYS NEEDED TO HAVE HER PRESENCE?

10          THE WITNESS:  WELL, YES.  SHE PROTECTED THEM FROM THE

11  ABUSE OF THEIR FATHER AS MUCH AS SHE COULD.  HE WOULD ABUSE

12  THEM WHILE SHE WAS AT WORK, BUT SHE PROTECTED THEM.  SO, YES.

13  AND THEN ONCE -- AFTER THE MURDER NOW SHE IS THEIR ONLY

14  SUPPORT, AND THEY ARE VERY GUILTY AND THEY FEEL GUILTY ABOUT

15  BEING A PART OF THE DEATH OF MISS BRITT LEWIS.

16          THE COURT:  BUT THIS IS NOT A PHENOMENON THAT HAS COME

17  ABOUT, LET'S SAY, SINCE THE DEATH OF MISS LEWIS, THIS HAS

18  BEEN -- THIS NEED OF THE CHILDREN FOR THEIR MOTHER HAS EXISTED

19  FOR SEVERAL YEARS?

20          THE WITNESS:  SINCE THEY WERE --

21          THE COURT:  SINCE THEY WERE BORN.

22          THE WITNESS:  THEY HAVE BEEN ABUSED SEVERELY BY THEIR

23  FATHER SINCE THEY WERE BORN.  THE DEATH OF MISS LEWIS HAS

24  EXACERBATED, AND THEY ARE SO TERRORIZED BY MR. VILLEGAS AND THE

25  THOUGHT OF THEM -- THEY CAN'T EVEN REALLY SPEAK ABOUT BEING

1  DEPOSED AND HAVING TO SIT IN THE SAME ROOM WITH HIM OR HAVING

2  TO TESTIFY AT A TRIAL.

3           THE COURT:  THANK YOU.

4           THE WITNESS:  YES.

5  BY MR. STICKNEY:

6  Q.  YOU HAVE BEEN DOING THIS FOR 10 YEARS.  IT'S OBVIOUS TO THE

7  ENTIRE COURTROOM THAT YOU ARE A VERY CAPABLE AND SUCCESSFUL

8  CLINICAL FORENSIC PSYCHOLOGIST.  ARE YOU CHARGING MY CLIENT FOR

9  YOUR HELP?

10 A.  I HAVEN'T CHARGED HER SINCE THE INITIAL EVALUATION.

11 Q.  WHY IS THAT?

12 A.  BECAUSE SHE WAS IN SUCH DESPERATE NEED AND I FELT IT WAS MY

13 DUTY.  I COULD NOT LET THIS WOMAN CONTINUE TO SUFFER WITHOUT MY

14 HELP.  I JUST -- I COULDN'T TURN MY BACK ON HER, THERE WAS NO

15 WAY, AND ON THIS FAMILY.  THIS IS SUCH AN EXTRAORDINARY

16 POWERFULLY TRAUMATIC CONFLUENCE OF THINGS, AND SHE DESPERATELY

17 NEEDED HELP.  I FELT A DUTY THAT I COULDN'T TURN MY BACK ON

18 HER.

19 Q.  AND YOU ARE HERE VOLUNTARILY AND NOT BY SUBPOENA OR

20 OTHERWISE?

21 A.  YES, SIR.

22          MR. STICKNEY:  NO FURTHER QUESTIONS.

23          THE COURT:  CROSS-EXAMINATION.

24

25

1                            CROSS EXAMINATION

2     BY MR. LAVECCHIO:

3     Q.   JUST A COUPLE OF QUESTIONS.

4              GOOD MORNING, DOCTOR.

5     A.   GOOD MORNING.

6     Q.   BASED ON YOUR MENTAL STATE EXAMINATION, IT'S CLEAR THAT

7     THIS DEFENDANT AT THE TIME THAT SHE WAS COMMITTING THIS OFFENSE

8     UNDERSTOOD THE NATURE AND CONSEQUENCE OF HER ACTS, CORRECT?

9     A.   I GUESS IT DEPENDS ON HOW WE DEFINE NATURE AND CONSEQUENCE.

10    SHE DIDN'T KNOW THE -- WHAT WAS GOING ON WITH THE WHOLE SCHEME.

11    SHE KNEW THAT FORGING THE DOCUMENTS WAS ILLEGAL.  SO, YES, SHE

12    KNEW THE NATURE AND CONSEQUENCE OF THAT.

13    Q.   AND SHE WAS ABLE TO CONTROL HER BEHAVIOR.

14    A.   YES, SIR.

15    Q.   AND SHE KNEW THE DIFFERENCE BETWEEN RIGHT AND WRONG.

16    A.   YES, SIR.

17    Q.   IN FACT, DURING THE COURSE OF THE SCHEME SHE EXHIBITED

18    CERTAIN CONSCIOUSNESS OF GUILT, DIDN'T SHE?

19    A.   YES, SIR.

20    Q.   WERE YOU AWARE THAT AT ONE POINT DURING THE COURSE OF THE

21    SCHEME SHE ACTUALLY REMARKED TO SOMEONE ELSE AT THE LAW FIRM,

22    NOT MR. ROTHSTEIN TO SOMEONE ELSE AT THE LAW FIRM, "WE ARE ALL

23    GOING TO JAIL."

24    A.   YES.

25    Q.   SHE TOLD YOU ABOUT THAT.

```
 1  A.  YES, SIR.

 2  Q.  AND NOTWITHSTANDING HER PTSD SHE AT ALL TIMES MAINTAINED

 3  HER ABILITY TO REASON, CORRECT?

 4  A.  YES, SIR.

 5  Q.  IN FACT, NOTWITHSTANDING HER PTSD SHE WAS HIGHLY

 6  FUNCTIONAL, CORRECT?

 7  A.  SHE WAS SURPRISINGLY SHOCKINGLY FUNCTIONAL.  YES, SIR,

 8  THAT'S HOW SHE SURVIVED.  THE REASON WHY WE SEE THE

 9  DECOMPENSATION NOW WAS THAT WORK KEPT HER STABLE, AND THE LOSS

10  OF THE JOB, AND THE LOSS OF WORK COMPLETELY DESTABILIZED

11  EVERYTHING THAT SHE HAD HELD TOGETHER FOR HER ENTIRE LIFE UP

12  UNTIL THIS POINT.

13  Q.  SO THESE MANIFESTATIONS REALLY OCCURRED -- THESE GROSS

14  MANIFESTATIONS OCCURRED FOLLOWING THE TIME THAT SHE REALIZED

15  SHE WAS GOING TO BE PROSECUTED.

16  A.  IT WASN'T ABOUT BEING PROSECUTED.  IT WAS -- I MEAN, YES,

17  IT WAS THE SAME TIME.  IT WAS FOLLOWING KNOWING THAT SHE HAD

18  NOT -- FEELING THAT SHE HAD NOTHING LEFT TO DEFINE HER.  SHE

19  ALWAYS DEFINED HERSELF AS A SURVIVOR, A HARD WORKER, AND SHE

20  LOST HER IDENTITY AND SHE LOST HER ABILITY TO FOCUS.

21          IN ORDER TO SURVIVE THE DEATH AND THE MURDER OF

22  MISS LEWIS SHE WENT TO WORK AND SHE JUST -- SHE PUT HER HEAD

23  DOWN AND KEPT GOING TO WORK, AND KEPT GOING TO WORK TO TRY TO

24  KEEP HERSELF FROM COMPLETELY FALLING APART TO MAINTAIN HER

25  ABILITY TO SUPPORT HER FAMILY.
```

 1  Q.  AND WHILE SHE IS COMMITTING THIS CRIME SHE IS ALSO RUNNING

 2  ESSENTIALLY THE ADMINISTRATIVE ASPECT OF A 70 PERSON LAW FIRM.

 3  A.  RIGHT.

 4  Q.  AND WHEN WAS IT THAT MISS LEWIS DIED?

 5  A.  IT WAS MARCH 5TH 2008.

 6  Q.  AND AT THAT POINT THE DEFENDANT HAD ALREADY BEEN ENGAGING

 7  IN CRIMINAL ACTIVITY, THIS CRIMINAL ACTIVITY FOR A SUBSTANTIAL

 8  PERIOD OF TIME, CORRECT, SINCE 2007.

 9  A.  NO, SIR.  IT'S MY UNDERSTANDING THAT IT WAS A MONTH OR

10  TWO -- MAYBE JANUARY OR FEBRUARY.  SO JUST THE MONTH OR TWO

11  PRIOR.

12  Q.  BUT IT PREDATED HER DEATH.

13  A.  YES, SIR.

14  Q.  THANK YOU.

15        MR. LAVECCHIO:  NO FURTHER QUESTIONS.

16        THE COURT:  ANY REDIRECT.

17        MR. STICKNEY:  NO, YOUR HONOR, JUST THAT -- WELL,

18  BRIEFLY.

19                  REDIRECT EXAMINATION

20  BY MR. STICKNEY:

21  Q.  CALEB AND ISAIAH ARE IN COURT TODAY, CORRECT?

22  A.  YES, SIR.

23  Q.  CAN YOU IDENTIFY THEM IN THE BACK ROW?

24        MR. STICKNEY:  JUDGE, CALEB IS THE SECOND ONE --

25        THE COURT:  THEY CAN STAND UP.

1          MR. STICKNEY:  ISAIAH IS IN THE WHITE SHIRT AND CALEB

2   IS IN THE --

3          THE COURT:  GOOD MORNING.

4          MR. STICKNEY:  NO FURTHER QUESTIONS.

5          THE COURT:  THANK YOU VERY MUCH.  YOU MAY STEP DOWN.

6   WATCH YOUR STEP, PLEASE.

7          THE WITNESS:  THANK YOU, YOUR HONOR.

8          THE COURT:  ALL RIGHT, MR. STICKNEY.

9          MR. STICKNEY:  YOUR HONOR, WE HAVE THE PENDING REQUEST

10  -- MOTION TO THE COURT FOR THE ACCEPTANCE OF RESPONSIBILITY, A

11  DOWNWARD DEPARTURE PURSUANT TO 5K2.0.

12          WOULD YOU LIKE ARGUMENT ON THAT OR --

13          THE COURT:  YES.  ARGUE IT ALL AT THIS POINT,

14  EVERYTHING ON YOUR MOTION FOR A DOWNWARD DEPARTURE AND YOUR

15  REQUEST FOR A VARIANCE, AND THEN I AM GOING TO HEAR FROM THE

16  GOVERNMENT.

17          MR. STICKNEY:  THANK YOU, YOUR HONOR.

18          THE COURT:  I DO NOT THINK THAT THE GOVERNMENT

19  DISPUTES THAT THE COURT HAS THE DISCRETION TO DEPART DOWNWARD

20  IF I MAKE THAT DECISION.

21          MR. KAPLAN:  NO, YOUR HONOR.

22          THE COURT:  ALL RIGHT.

23          THE COURT:  SO THAT IS NOT AN ISSUE.  YOU NEED TO TELL

24  ME WHY YOU WANT ME TO DEPART.  I KNOW I HAVE THE DISCRETION TO

25  DO IT.

1               MR. STICKNEY:  THANK YOU, YOUR HONOR.

2               THE COURT:  ALL RIGHT.

3               MR. STICKNEY:  YOUR HONOR, BY NOT GIVING ACCEPTANCE OF

4    RESPONSIBILITY --

5               THE COURT:  AND JUST SO EVERYONE IN THE COURTROOM IS

6    CLEAR, AGAIN, ON -- THE LAWYERS AND THE COURT UNDERSTANDS WHAT

7    IS GOING ON, BUT JUST SO EVERYONE IN THE COURTROOM IS CLEAR.

8               WHAT THE DEFENSE IS ASKING IS SINCE THE STATUTORY

9    MAXIMUM AT THIS POINT CONTROLS, THAT IS, 10 YEARS, THE DEFENSE

10   IS ASKING THE COURT TO DEPART BELOW THE 10-YEAR STATUTORY

11   MAXIMUM, BECAUSE THAT STATUTORY MAXIMUM, AND I WILL SAY IT

12   AGAIN, THAT CONTROLS THIS SENTENCING AT THIS STAGE RIGHT NOW.

13   THE COURT CANNOT GO HIGHER.  THE DEFENSE IS ASKING THE COURT TO

14   GO BELOW 10 YEARS.

15               GO AHEAD.

16               MR. STICKNEY:  AND I'M BIFURCATING, ONE, WITH THE

17   MOTION FOR THE DEPARTURE; AND SECOND, FOR THE VARIANCE, YOUR

18   HONOR.

19               THE COURT:  THAT IS FINE.

20               MR. STICKNEY:  AND THEY ARE KIND OF TIED TOGETHER.

21               WHY THE COURT SHOULD DEPART NOW RESTS IN LARGE PART

22   BECAUSE MY CLIENT ACCEPTED FULL RESPONSIBILITY IMMEDIATELY FOR

23   HER OFFENSE.  THE CHARGING DECISION THAT LED TO HER BEING

24   CHARGED WITH A 10-YEAR MAXIMUM STATUTE WAS PART OF THE FACT

25   THAT MY CLIENT PROBABLY CAME IN AND COOPERATED IMMEDIATELY WITH

1  THE AUTHORITIES.  NO ONE ELSE HAS.

2        THE COURT:  I AM GOING TO ASK THE GOVERNMENT IN THEIR

3  RESPONSE TO ADDRESS THAT ISSUE, AND WHETHER SHE HAS ALREADY

4  RECEIVED A BENEFIT.  BECAUSE OF THE CHARGING DECISION BY THE

5  GOVERNMENT WHAT WOULD HAVE HAPPENED HAD THE GOVERNMENT CHARGED

6  HEREWITH AN INDICTMENT, AND SO FORTH.  THAT WILL BE VERY

7  HELPFUL TO THE COURT, AND I THINK THAT THOSE SITTING IN THIS

8  COURTROOM SHOULD UNDERSTAND THAT PROCESS AS WELL.

9        MR. STICKNEY:  AND ANTICIPATING THAT, YOUR HONOR, MY

10  ARGUMENT IS THAT IT IS NOT JUST BASED ON THE FACT THAT SHE

11  COOPERATED FIRST.  IT'S BECAUSE OF THE CONDUCT THAT THE

12  GOVERNMENT BECAME AWARE OF.

13        SHE IS NOT SCOTT BRIGHT, SHE IS NOT SCOTT ROTHSTEIN,

14  SHE DID NOT KNOW THE FULL EXTENT OF THE SCHEME THAT HE WAS

15  INVOLVED WITH.  SHE HAD A LEVEL OF INVOLVEMENT THAT THE COURT

16  IS AWARE OF FROM HER CHANGE OF PLEA HEARING WHERE SHE WAS

17  FORGING DOCUMENTS, FORGING PEOPLES' NAMES, ENTERING FALSE

18  NUMBERS INTO THE SETTLEMENT AGREEMENTS.

19        I BELIEVE THAT THAT WAS PART OF THE CHARGING DECISION

20  ON THE GOVERNMENT, AND IT WAS NEGOTIATED, YOUR HONOR, THAT IT

21  IS MORE THAN JUST HER COOPERATION I BELIEVE.  I BELIEVE IT IS

22  HER ROLE IN THE OFFENSE MAKES THE CHARGE THAT SHE HAS PLED

23  GUILTY TO APPROPRIATE UNDER THESE CIRCUMSTANCES.

24        THE COURT SHOULD ALSO GRANT THE MOTION FOR A DOWNWARD

25  DEPARTURE BASED ON, ONE, THAT SHE CAME INTO THE U.S. ATTORNEY'S

1   OFFICE IN NOVEMBER OF 2009.  AS I HAVE PREVIOUSLY STATED NOBODY

2   ELSE HAS.  SHE HAS BEEN CONTINUOUSLY COOPERATING WITH THE

3   GOVERNMENT SINCE SHE -- SINCE NOVEMBER OF 2009.  SHE HAS MET

4   WITH FBI AND IRS AGENTS 13 TIMES IN PERSON AND SEVERAL OTHER

5   TIMES BY TELEPHONE.

6        TO THE EXTENT THAT IF I AM IN COURT AND SPECIAL AGENT

7   STOUT CALLS ROBERT STICKNEY, I CALL HIM BACK IMMEDIATELY.  IF

8   HE CALLS ME ON JULY 3RD, OR THE FRIDAY BEFORE THE JULY 4TH

9   WEEKEND AND REQUESTS A MEETING WITH ROBERT STICKNEY AND MY

10  CLIENT, I STOP WHAT I'M DOING AND I SCHEDULE A MEETING WITH

11  HIM.  IT WAS JULY 4TH WEEKEND.  FOR SEVERAL HOURS TWO AGENTS

12  WERE IN MY OFFICE WITH MISS VILLEGAS EXPLAINING THINGS TO THE

13  AGENTS.

14       MY CLIENT AT HER OWN EXPENSE -- AND THIS ISN'T SO MUCH

15  COOPERATION BECAUSE THAT WOULD BE A 5K, BUT JUST WHAT SHE HAS

16  DONE SO THE COURT UNDERSTANDS WHO SHE IS HOW MUCH

17  RESPONSIBILITY SHE HAS ACCEPTED FOR HER OFFENSE.  SHE HAS

18  ACCEPTED SO MUCH RESPONSIBILITY SHE IS TAKING IT UPON HERSELF

19  TO FIX THE WRONG THAT SHE HAS COMMITTED, AND THAT SHE HAS BEEN

20  INVOLVED WITH.  TO WHATEVER DEGREE THAT SHE CAN SHE WANTS TO

21  FIX IT.

22       SO I KNOW THIS BOARDERS ON TALKING ABOUT A REDUCTION

23  FOR COOPERATION, AND I DON'T WANT TO BECAUSE THAT HOPEFULLY

24  WILL COME SOMETIME IN THE FUTURE.  BUT SHE ACCEPTED

25  RESPONSIBILITY.  SHE WENT TO THE EXTENT OF BUYING A HARD DRIVE

 1  AT HER OWN EXPENSE, AND SHE IS INDIGENT NOW, SO COMING OUT OF

 2  FAMILY MONEY -- THE COURT HAS SEEN IN THE PSR HER EXPENSES AND

 3  WHERE SHE SITS NOW FINANCIALLY, AND SHE BOUGHT A HARD DRIVE SO

 4  THAT SHE COULD GET IRS TO COPY HER COMPUTER FROM THE LAW FIRM

 5  SO SHE CAN GO THROUGH HER E-MAILS.

 6       SHE WENT THROUGH 15,000 E-MAILS AND SHE PICKED OUT,

 7  BASED ON THE INVESTIGATOR'S INSTRUCTIONS, 60 THAT WERE MOST

 8  RELEVANT TO WHAT THEY WERE LOOKING AT, AT THE TIME.  AND WHAT

 9  THEY WERE LOOKING AT, AT THE TIME CHANGES AS THE INVESTIGATION

10  PROCEEDS, AND IT SHIFTS FROM ONE AREA OF VIOLATIONS TO ANOTHER.

11       THIS INVESTIGATION IS NOT OVER NOW, AND I DON'T THINK

12  IT IS GOING TO BE OVER ANY TIME SOON YOUR HONOR.  WE ARE GOING

13  TO ASK FOR A SELF-SURRENDER DATE SOMETIME AT THE FUTURE AT THE

14  END OF THE HEARING.  I'M GOING TO ASK FOR THAT BECAUSE HER

15  COOPERATION IS CONTINUING AND IF SHE IS SENT AWAY TO PRISON, IF

16  THE COURT DOESN'T GIVE HER PROBATION AND HOUSE ARREST, AND SHE

17  IS SENT AWAY TO PRISON IT'S GOING TO MAKE IT THAT MUCH MORE

18  DIFFICULT TO COOPERATE, AND THERE ARE OTHER LEGS OF THIS THAT I

19  CAN'T DISCUSS OF THIS IN OPEN COURT THAT ARE BEING DEVELOPED.

20       SHE BOUGHT THE HARD DRIVE BUT BEFORE SHE COULD REVIEW

21  IT SHE HAD TO BRING IT TO A COMPUTER FORENSIC, A COMPUTER

22  SPECIALIST, TO PRUDENCE CORPORATION TO UNRAVEL IT SO SHE CAN

23  LOOK AT IT ON HER COMPUTER FROM HOME, AND IT GAVE HER SOMETHING

24  TO DO.  EVERY TIME AGENT SCOTT CALLS OR ANY OTHER AGENT WE ARE

25  AT THEIR BECKON CALL, YOUR HONOR.

 1           SO FOR THOSE REASONS I THINK THAT SHE DESERVES CREDIT

 2  FOR ACCEPTANCE OF RESPONSIBILITY, WHICH IS LOST IN THE

 3  STRUCTURE OF THE GUIDELINES HERE AND BECAUSE THE MAXIMUM

 4  SENTENCE IS LOWER THAN THE GUIDELINES.

 5           I WOULD ASK THAT IF THE COURT -- THERE ARE VARIOUS

 6  WAYS THE COURT CAN CONSIDER HOW MUCH TIME TO REDUCE HER

 7  SENTENCE.  SHE WAS A LEVEL 43 BEFORE ACCEPTANCE.  THAT'S LIFE,

 8  YOUR HONOR, AS YOU KNOW, AND THEN SHE BECAME A LEVEL 40 WHICH

 9  MADE IT 292 MONTHS.

10           SO THERE IS ONE WAY THAT THE COURT CAN FASHION THIS,

11  IT'S JUST A WAY I WOULD LIKE TO FASHION IT BUT IT MIGHT NOT

12  MAKE THE MOST SENSE.  THE DIFFERENCE BETWEEN 292 MONTHS AND

13  LIFE, WHATEVER THAT IS, THAT THE COURT CAN REDUCE HER 120

14  SENTENCE IN THAT REGARD.  I'M NOT SURE IF THAT'S THE MOST

15  REASONABLE WAY TO APPROACH THIS.

16           I THINK THE MORE REASONABLE WAY WOULD BE TO CALCULATE

17  THE GUIDELINES OFFENSE LEVEL FOR 120 MONTHS AND REDUCE THAT

18  THREE, TO GIVE THE COURT A BENCHMARK AND SOME PARAMETERS TO

19  WORK WITH SO WE CAN MAKE A REASONABLE DECISION AS TO HOW MUCH

20  HER SENTENCE SHOULD BE REDUCED FOR ACCEPTANCE.  AND THAT WOULD

21  BE FROM A LEVEL -- I THINK SHE IS -- A LEVEL 32, YOUR HONOR, A

22  CRIMINAL HISTORY CATEGORY ONE, AND WHICH WE HADN'T SAID TODAY

23  BUT SHE HAS NO CRIMINAL HISTORY.  SHE IS 43 YEARS OLD.  FOR THE

24  TYPE OF LIFE THAT SHE HAS LED SO FAR, TO BE A 43 YEAR OLD AND

25  NEVER HAVE AN ENCOUNTER WITH LAW ENFORCEMENT, NOT DRINK

1  EXCESSIVELY, I THINK SHE IN THE PSR IT SAYS FIVE BEERS A YEAR,

2  NOT BE A DRUG ABUSER, SHE IS ACTUALLY A MODEL CITIZEN FOR HER

3  CHILDREN.

4        IT'S EXTREMELY UNFORTUNATE SHE SUCCUMBED TO

5  MR. ROTHSTEIN'S SCHEME.  IF THE COURT GOES FROM A LEVEL 32 IS A

6  121 MONTHS TO 151, A LEVEL 30 IS 108 TO 135.  WITH A SENTENCE

7  OF 120 MONTHS I GUESS THAT'S CLOSE TO A LEVEL 32.  FROM 32

8  REDUCED TO THREE POINTS TO 29 IS 87 MONTHS, WHICH IS A -- ABOUT

9  A 34 MONTH DIFFERENCE IS WHAT THE GUIDELINES CALCULATE FOR

10  ACCEPTANCE IN THAT RANGE FROM 135 -- I'M SORRY, FROM 121 DOWN

11  TO 87 IS 34 MONTHS.  SO THAT WOULD BE THE REDUCTION THAT -- I

12  THINK THE GUIDELINES WILL CONTEMPLATE IN THIS SITUATION, YOUR

13  HONOR.

14        MOVING ON TO -- AS I'VE ALREADY STATED THE

15  RECOMMENDATION FROM -- FROM THE DEFENSE IS THAT THE COURT

16  STRONGLY CONSIDER NOT TAKING MY CLIENT AWAY FROM HER CHILDREN.

17  MY CLIENT UNDERSTANDS HER FAULT, YOUR HONOR, AND THE COURT --

18  IT IS -- IT'S HER OWN FAULT IF SHE IS TAKEN AWAY FROM HER

19  CHILDREN.  SHE IS ONLY ASKING -- IN HER LETTER SHE ADDRESSES

20  THAT TO THE COURT.

21        THE COURT:  LET ME JUST MAKE SURE ON ONE POINT.  THANK

22  YOU FOR BRINGING THAT UP BECAUSE I FORGOT TO MAKE SURE THAT THE

23  RECORD IS CLEAR ON THIS.

24        DID THE GOVERNMENT RECEIVE WHAT I AM SIMPLY GOING TO

25  REFER TO AS THE PACKET THAT WAS SUBMITTED TO THE COURT

1   YESTERDAY, THE LETTERS AND SO FORTH?

2           MR. KAPLAN:  YES, YOUR HONOR.

3           THE COURT:  ALL RIGHT.  FINE.

4           AND DID PROBATION RECEIVE THAT?

5           THE PROBATION OFFICER:  WE MAY HAVE, YOUR HONOR.

6           THE COURT:  ALL RIGHT.  GO AHEAD.

7           MR. STICKNEY:  I DO BELIEVE THAT I SENT IT TO TRACY

8   WEBB WHO IS NOT HERE TODAY.

9           THE COURT:  WE WILL GET IT TO THEM.

10          MR. STICKNEY:  THANK YOU, YOUR HONOR.

11          MY CLIENT STATED IN HER LETTER THAT IT IS NOT HER THAT

12  SHE IS WORRIED ABOUT.  SHE IS TRYING TO PROTECT HER CHILDREN.

13  SHE IS NOT TRYING -- AND SHE DOESN'T WANT THE COURT TO THINK

14  THAT SHE IS TRYING TO USE HER CHILDREN AS A BASIS NOT TO GO TO

15  JAIL.  SHE IS WILLING TO GO TO JAIL.

16          IF THE COURT COULD FASHION A SENTENCE THAT WOULD ALLOW

17  HER GO TO JAIL AFTER TONY VILLEGAS' TRIAL IS OVER, AND AFTER

18  ISAIAH IS FINISHED WITH HIGH SCHOOL, SHE WOULD GO.  THAT'S WHAT

19  SHE WOULD ASK FOR.  I DON'T KNOW THAT THE COURT CAN FASHION A

20  SENTENCE THAT WAY.

21          SHE IS ASKING FOR A SENTENCE OF PROBATION WITH AS

22  LARGE A TERM OF HOME CONFINEMENT DURING THAT PROBATION AS THE

23  COURT WILL ALLOW.  AND I THINK OTHER DISTRICT COURTS HAVE

24  CONSIDERED HOME CONFINEMENT AS A SUITABLE ALTERNATIVE TO

25  INCARCERATION DIRECT INCARCERATION.  YOUR HONOR, I THINK THAT

 1  -- WE WOULDN'T -- IF THE COURT WANTED TO GIVE HER SEVEN YEARS

 2  PROBATION WITH SEVEN YEARS OF HOME CONFINEMENT SHE WOULD PREFER

 3  THAT AS AN ALTERNATIVE TO ANY PERIOD OF INCARCERATION WHERE SHE

 4  IS BEING REMOVED FROM HER CHILDREN.

 5          THE COURT:  BUT THAT WOULD BE ILLEGAL.

 6          MR. STICKNEY:  WE WOULDN'T APPEAL IT.  AND WE WOULDN'T

 7  APPEAL IT, YOUR HONOR.  THAT'S THE DEGREE TO WHICH --

 8          THE COURT:  BUT THE GOVERNMENT MIGHT.

 9          MR. STICKNEY:  WE WOULD HOPE THAT THEY WOULDN'T BUT

10  THEY MIGHT.  BUT I THINK IT WOULD MAKE IT LOOK MORE REASONABLE

11  TO THE ELEVENTH CIRCUIT THAT DEGREE OF HOME CONFINEMENT, YOUR

12  HONOR, IT WOULD BE EXCEPTIONAL.  BUT THAT'S WHAT WE ARE ASKING

13  THE COURT.  THERE IS NO -- I WOKE UP EARLY THIS MORNING AND

14  STARTED THINKING ABOUT IF I WERE IN YOUR SHOES WHAT WOULD BE --

15  SOUND REASONABLE, AND THIS IS A TOUGH ARGUMENT TO MAKE, YOUR

16  HONOR, WHEN SHE IS FACING A 120 MONTHS.

17          THE COURT:  I UNDERSTAND.

18          MR. STICKNEY:  BUT, YOU KNOW, I THOUGHT ABOUT -- WELL,

19  WHAT ABOUT FOR EVERY DAY THAT SHE WAS INVOLVED IN THIS FRAUD,

20  21 MONTHS, WOULD THAT BE REASONABLE.  AND -- AND, YES, I THINK

21  THAT WOULD BE REASONABLE ALSO WITH PROBATION TO FOLLOW AND A

22  TERM OF HOME CONFINEMENT AS A SPECIAL CONDITION OF HER

23  SUPERVISED RELEASE FOLLOWING THAT 21 MONTHS INCARCERATION.

24          THEN I WENT BACK TO THE FAMILY FACTORS, YOUR HONOR,

25  AND I MET WITH MISS BRITT LEWIS TODAY, I HAVE SPOKEN TO HER

```
 1  SEVERAL TIMES ON THE TELEPHONE, AND I MET WITH THE CHILDREN
 2  TODAY AND I DO NOT THINK THAT -- THE FAMILY FACTORS I THINK ARE
 3  THE MOST RELEVANT IN THIS SENTENCING TODAY, AND IT IS NOT
 4  BECAUSE I'M LOOKING FOR SYMPATHY FOR MY CLIENT.
 5          I AM LOOKING WAY PAST THAT.  I'M LOOKING AT THE FACT
 6  THAT THEIR FATHER IS IN JAIL FOR MURDERING THEIR MOTHER'S BEST
 7  FRIEND.  WHAT THE COURT IS UNAWARE OF TO THIS POINT IS THAT
 8  THEIR MOTHER'S BEST FRIEND WAS A CAREGIVER FOR THE FAMILY.
 9          MELISSA BRITT LEWIS WOULD COME TO THE HOUSE AND COOK
10  DINNER AND WAS A CONSTANT FIXTURE AT THE HOUSE SUPPORTING THOSE
11  KIDS.  SHE WOULD TAKE THEM TO DISNEY WORLD WITH THE DEFENDANT.
12  SHE WAS A HUGE PART OF THEIR LIFE.  AND ISAIAH -- AND I WILL
13  PROFFER THIS TO THE COURT, BUT ISAIAH WAS ASKED BY HIS FATHER
14  TO MOVE IN WITH HIM AND HE SAID, "NO, I'M GOING TO STAY WITH MY
15  MOTHER."  A WEEK LATER AUNT MELISSA, MELISSA BRITT LEWIS IS
16  DEAD.
17          ISAIAH IS AN ELEVEN YEAR OLD BOY SEE THE TWO THAT ARE
18  INEXTRICABLY INTERTWINED EVENTS IN HIS LIFE AND HE FEELS
19  RESPONSIBLE.  THAT'S WHY HE TRIED TO HARM HIMSELF.  THAT'S WHY
20  HE HAD TO GO TO UTAH, AS THE COURT SAW IN THE LETTERS TO LIVE
21  ON THE RANCH AND TO INTERACT WITH THE HORSES AND OTHER LARGE
22  ANIMALS, AND THAT'S WHY -- THAT'S WHAT HAPPENED.
23          HE IS NOW HOME, AND YOU CAN SEE IN COURT HE IS PUTTING
24  HIMSELF BACK TOGETHER.  HE IS A 13 YEAR OLD, HE IS IN SCHOOL,
25  HE'S DOING WELL, AND THAT'S BECAUSE OF MY CLIENT'S PRESENCE.
```

1  SO I'M NOT ASKING THIS FOR MY CLIENT, I'M ASKING THAT THE COURT

2  USE ITS DISCRETION TO INTERVENE IN THIS SITUATION, IT'S A

3  HORRIBLE SITUATION, AND TO TRY TO FIX AS BEST THIS COURT CAN A

4  HORRIBLE SITUATION.

5        WITH THE CAVEAT ALSO, SHE IS CONTINUING HER

6  COOPERATION.  IF THE COURT INCARCERATES HER FOR 10 YEARS SHE

7  WILL CONTINUE HER COOPERATION.  IF YOU GIVE HER PROBATION WITH

8  HOME -- HOUSE ARREST, HOME DETENTION, SHE WILL CONTINUE HER

9  COOPERATION BECAUSE OF THE REMORSE SHE FEELS FOR WHAT SHE DID,

10 HER DEBT TO SOCIETY TO FIX IT, AND BECAUSE IT'S THE TYPE OF

11 PERSON SHE IS.

12        SECONDLY, HER COOPERATION IS CONTINUING BUT WE DON'T

13 KNOW -- AND THE GOVERNMENT -- AS THE COURT IS AWARE OF THE

14 GOVERNMENT'S POLICY, IT'S NOT A POLICY, IT'S THE POSITION OF

15 THE PROSECUTORS IN THIS CASE AT THE U.S. ATTORNEY'S OFFICE THAT

16 THEY WILL NOTIFY A 5K1.1 AT THIS POINT IN THE PROCEEDINGS WHICH

17 WOULD ALLOW THE COURT TO DO JUST WHAT I'M ASKING.  THEY INTEND

18 TO EVALUATE MY CLIENT'S COOPERATION WHEN OTHERS HAVE BEEN

19 PROSECUTED.

20        THE COURT:  AND THEY HAVE THE RIGHT TO PROCEED IN THAT

21 FASHION.

22        MR. STICKNEY:  AND I -- AND I DON'T CRITICIZE THAT,

23 YOUR HONOR.

24        THE COURT:  I UNDERSTAND.  YOU ARE JUST TELLING ME THE

25 FULL PICTURE.

| | |
|---|---|
| 1 | MR. STICKNEY:  YES, YOUR HONOR. |
| 2 | THE COURT:  I UNDERSTAND. |
| 3 | MR. STICKNEY:  AND I HOPE -- I CAN'T SAY I FULLY -- |
| 4 | WELL, I FULLY EXPECT A RULE 35 AT SOME POINT IN THE FUTURE |
| 5 | WHERE THEN THE COURT CAN CONSIDER DOING JUST EXACTLY WHAT I'M |
| 6 | ASKING THE COURT TO DO.  AND WITH THE LEVEL OF -- AND AGAIN, |
| 7 | THE LEVEL OF HER COOPERATION AT THIS POINT IS AN INDICIA TO THE |
| 8 | COURT THAT SHE IS FULLY ON BOARD WITH THE PROSECUTION.  AS I'VE |
| 9 | STATE STATED, WHATEVER THEY NEED SHE WILL DO TO GET SHE WILL |
| 10 | GET THEM THE INFORMATION THAT SHE NEEDS, AND SHE HAS BEEN |
| 11 | HONEST WITH THEM FROM THE BEGINNING. |
| 12 | SO FOR THOSE REASONS, YOUR HONOR, I AM ASKING YOU TO |
| 13 | DO SOMETHING WHICH IS EXTRAORDINARY IN THIS CASE, BUT TO ALLOW |
| 14 | MY CLIENT TO REMAIN WITH HER FAMILY ON HOME DETENTION FOR ANY |
| 15 | PERIOD OF TIME THAT THE COURT DEEMS APPROPRIATE AND WE WON'T |
| 16 | APPEAL IT. |
| 17 | THE COURT:  LET ME JUST ASK YOU SOME QUESTIONS.  I |
| 18 | UNDERSTAND THAT YOU ARE DOING YOUR JOB ON BEHALF OF YOUR |
| 19 | CLIENT, BUT I HAVE TO ASK YOU SOME QUESTIONS, AND SOME OF THESE |
| 20 | WILL BE HARD QUESTIONS. |
| 21 | FIRST OF ALL -- AND IF THE GOVERNMENT WISHES TO ASSIST |
| 22 | IN THESE ANSWERS FELL FREE TO DO SO.  I AM STILL GOING TO HEAR |
| 23 | FROM YOU, BUT IF YOU WISH TO ASSIST THE COURT FEEL FREE TO DO |
| 24 | SO. |
| 25 | THE PRESENTENCE REPORT, THE REVISED PSR, THE |

 1 | GOVERNMENT HAS SEEN IT AND THE DEFENSE HAS SEEN IT, BUT CAN YOU
 2 | GIVE ME A TIME LINE WHEN DID YOUR CLIENT -- WHEN WAS SHE FIRST
 3 | HIRED BY ROTHSTEIN?
 4 |        MR. STICKNEY:  YOUR HONOR, THAT'S INTERESTING.  MY
 5 | OFFICE IS ON THE 25TH FLOOR RIGHT UNDERNEATH THE TOWER CLUB.
 6 | HER OFFICE WITH ROTHSTEIN MAYBE 17 AGO WAS WITH MR. HADDAD WHO
 7 | IS ONE FLOOR ABOVE ME AND THAT WAS 17 YEARS AGO.
 8 |        THE COURT:  SO 17 YEARS AGO IS WHEN SHE FIRST STARTED
 9 | WITH ROTHSTEIN.
10 |        MR. STICKNEY:  YES, YOUR HONOR.
11 |        THE COURT:  AS WHAT, HIS SECRETARY?
12 |        MR. STICKNEY:  AS A LEGAL SECRETARY TURNED PARALEGAL.
13 |        THE COURT:  BUT FOR ROTHSTEIN.  THAT WAS A GROUP THAT
14 | WAS SHARING OFFICES BACK THEN.
15 |        MR. STICKNEY:  RIGHT.  IT'S MY UNDERSTANDING --
16 |        THE COURT:  WELL, CHECK WITH HER IF YOU NEED TO.
17 |        MR. STICKNEY:  AND MY CLIENT --
18 |        THE COURT:  CHECK WITH HER.
19 |        MR. STICKNEY:  SHE CAN ADDRESS THE COURT ALSO IF YOU
20 | DON'T MIND, YOUR HONOR.
21 |        THE COURT:  WELL, I JUST WANT TO HEAR LEGAL ARGUMENT
22 | RIGHT NOW.
23 |        MR. STICKNEY:  OKAY.  GREAT.
24 |        AUGUST OF 1992 FOR MR. ROTHSTEIN ALONE AS HIS SOLE
25 | PARALEGAL YET SHARING SPACE WITH OTHER LAWYERS.

```
 1              THE COURT:  ALL RIGHT.  AND WHEN DID SHE BECOME --
 2   WELL, LET ME BACK UP FOR A MINUTE.  WHEN WAS R.R.A. FORMED?
 3   APPROXIMATELY.
 4              MR. STICKNEY:  2005 YOUR HONOR.
 5              THE COURT:  IN 2005.
 6              MR. STICKNEY:  IN FEBRUARY OF 2005.  IT WAS IN A
 7   DIFFERENT BUILDING, YOUR HONOR.
 8              THE COURT:  I AM NOT INTERESTED IN THE PLACE --
 9              MR. STICKNEY:  2005.
10              THE COURT:  -- I JUST WANT TO GET A TIME LINE HERE.
11              WHEN DID YOUR CLIENT BECOME WHAT IS REFERRED TO IN THE
12   PSR AS THE CHIEF OPERATING OFFICER?
13              MR. STICKNEY:  IN 2005.  WHEN IT BECAME R.R.A. SHE
14   BECAME THE CHIEF OPERATING OFFICER.
15              THE COURT:  ALL RIGHT.  AND WHEN WAS THE FIRST TIME
16   THAT THE DEFENDANT ENGAGED IN CRIMINAL ACTIVITY THAT BRINGS US
17   HERE TODAY?
18              MR. STICKNEY:  YOUR HONOR, TEMPORALLY IT WAS ABOUT A
19   MONTH BEFORE MELISSA WAS KILLED WHICH WAS MARCH 5TH, 2008.  SO
20   THAT MAKES IT FEBRUARY -- IT WAS EITHER JANUARY OR FEBRUARY OF
21   2008, TO THE BEST OF OUR RECOLLECTION.
22              THE COURT:  MR. KAPLAN.
23              MR. KAPLAN:  WELL, IN THE PROFFER OF FACTS WE STATED
24   IT WAS IN OR ABOUT 2007.  I WENT BACK.  THERE WAS SOMETHING
25   CALLED DEAL FOLDERS, THE DOCUMENTATION SHE WAS PUTTING TOGETHER
```

```
 1  TO ASSIST, AND THE EARLIEST DEAL FOLDERS -- ONE OF THE EARLIEST
 2  DEAL FOLDERS WAS SEPTEMBER 26TH OF 2007.  SO IT WOULD HAVE BEEN
 3  SOMEWHERE AROUND THERE.
 4          MR. STICKNEY:  AND, YOUR HONOR, I AM NOT SURE.  SHE
 5  DIDN'T FORGE ANY NAMES BEFORE THAT.  SO THERE IS -- SHE DIDN'T
 6  KNOW WHAT WAS GOING ON PRIOR TO -- WHEN SHE SAYS FEBRUARY OF
 7  2008, THAT'S WHEN SHE WAS ASKED TO FORGE SOMEBODY'S NAME.
 8  THAT'S WHEN SHE REALIZED THERE WAS CRIMINAL CONDUCT AFOOT.
 9          MR. KAPLAN:  SOMEBODY HAD TO FORGE THESE NAMES BECAUSE
10  THERE WERE NAMES ON THIS DOCUMENTATION.  IF HE WANTS A COPY I
11  CAN PROVIDE HIM WITH A COPY OF THE DOCUMENTATION.
12          MR. STICKNEY:  WE DON'T CONTEST THESE FACTS, YOUR
13  HONOR, WE JUST -- SHE DIDN'T KNOW THAT THERE WAS ANYTHING
14  ILLEGAL AFOOT UNTIL FEBRUARY OF 2008 --
15          THE COURT:  BUT --
16          MR. STICKNEY:  -- A FIVE MONTH DIFFERENCE.
17          THE COURT:  -- DO YOU CONCEDE THAT SHE FALSIFIED THOSE
18  SIGNATURES?
19          MR. STICKNEY:  THE SIGNATURES ARE BLOCKED OUT, THEY
20  ARE REDACTED, BLACKED OVER.  HER SIGNATURE IS ON IT AS THE
21  NOTARY.
22          MR. KAPLAN:  DID SHE NOTARIZE THE SIGNATURE?
23          THE COURT:  GIVE HER THE PIECE OF PAPER.  I MEAN, OPEN
24  IT UP TO WHAT YOU WERE LOOKING AT --
25          MR. KAPLAN:  I'M SORRY.
```

 1          MR. STICKNEY:  YOUR HONOR, IF YOU DIDN'T HEAR WHAT MY

 2  CLIENT WAS SAYING.

 3          THE COURT:  NO.

 4          MR. STICKNEY:  SHE IS STATING THAT -- THERE IS NO

 5  INDICATION THAT SHE SIGNED THIS.  IT COULD HAVE BEEN

 6  MR. ROTHSTEIN --

 7          THE COURT:  -- WHO FORGED THE SIGNATURE BUT SHE

 8  NOTARIZED IT.

 9          MR. STICKNEY:  SHE NOTARIZED IT, YES, YOUR HONOR.  BUT

10  SHE DIDN'T -- WELL, SHE NOTARIZED IT THEN -- IF SHE NOTARIZED

11  IT THEN SHE MUST HAVE EITHER SEEN IT OR NOTARIZED IT AFTER THE

12  FACT.

13          THE COURT:  ALL RIGHT.  BUT THEN YOU ARE SAYING THAT

14  IN FEBRUARY -- APPROXIMATELY IN FEBRUARY OF 2008 IS WHEN YOUR

15  CLIENT FIRST STARTED FALSIFYING SIGNATURES.

16          MR. STICKNEY:  FORGING SIGNATURES ON HER OWN, YES,

17  YOUR HONOR.

18          THE COURT:  AND FORGING SIGNATURES ON WHAT DOCUMENTS?

19          MR. STICKNEY:  SETTLEMENT AGREEMENTS, YOUR HONOR.

20          THE COURT:  STRICTLY SETTLEMENT AGREEMENTS.

21          MR. STICKNEY:  YES, YOUR HONOR.

22          (DEFENDANT CONFERRING WITH MR. STICKNEY)

23          MR. STICKNEY:  THERE WAS ONE DOCUMENT OTHER THAN THE

24  SETTLEMENT AGREEMENTS THAT HAS TO DO WITH THE DEAL PACKET THAT

25  MR. KAPLAN HAS REFERRED TO, BUT BASICALLY ALMOST EXCLUSIVELY IT

 1  WAS SETTLEMENT AGREEMENTS WITH THAT ONE EXCEPTION.

 2          THE COURT:  ALL RIGHT.  NOW, PARAGRAPH 15 OF THE

 3  REVISED PSR BASICALLY SAYS THAT THE CO-CONSPIRATORS INCLUDING

 4  VILLEGAS CREATED FALSE AND FRAUDULENT SETTLEMENT AGREEMENTS,

 5  BANK STATEMENTS, ASSIGNMENTS OF SETTLEMENT AGREEMENTS, SALE AND

 6  TRANSFER AGREEMENTS, AND PERSONAL GUARANTEES, AMONG OTHER

 7  DOCUMENTS.  WAS YOUR CLIENT INVOLVED IN THOSE OTHER TYPES OF

 8  DOCUMENTS?

 9          MR. STICKNEY:  ONE SECOND, YOUR HONOR.

10          (DEFENDANT CONFERRING WITH  MR. STICKNEY)

11          MR. STICKNEY:  WOULD YOU LIKE HER TO TESTIFY TO THIS,

12  YOUR HONOR?

13          THE COURT:  SURE.  YOU CAN STEP UP TO THE PODIUM.

14          MR. STICKNEY:  THANKS.  BECAUSE I --

15          THE COURT:  GO AHEAD.

16          THE DEFENDANT:  THERE IS A LARGE PACK OF DOCUMENTS

17  THAT --

18          THE COURT:  USE THE MICROPHONE.

19          THE DEFENDANT:  THERE IS A LARGE PACK OF DOCUMENTS

20  THAT WOULD MAKE UP WHAT MR. ROTHSTEIN WOULD REFER TO AS A DEAL

21  PACKET, BUT THERE WERE ONLY TWO OF THOSE DOCUMENTS THAT

22  REQUIRED THE SIGNATURE.  SO THERE WERE MULTIPLE DOCUMENTS THAT

23  DIDN'T HAVE TO BE SIGNED BY THE PLAINTIFF.

24          THE COURT:  SO YOU FALSIFIED -- JUST SO THE RECORD IS

25  CLEAR, YOU FALSIFIED THE SIGNATURE OR SIGNATURES OF PLAINTIFFS.

1          THE DEFENDANT:  YES, YOUR HONOR.

2          THE COURT:  AND WERE YOU INVOLVED IN THE CREATION OF

3   ANY OTHER FALSE DOCUMENTS?  EVEN THOUGH YOU MIGHT NOT HAVE

4   FALSIFIED A SIGNATURE DID YOU ASSIST IN THE PREPARATION OF

5   OTHER FALSE DOCUMENTS?

6          THE DEFENDANT:  PREPARATION IS AN ODD WORD.  I DIDN'T

7   PREPARE ANY OF THESE DOCUMENTS.  I DIDN'T CREATE ANY OF THESE

8   DOCUMENTS.  ALL I DID WAS INSERT THE PLAINTIFF'S NAME, PRINT IT

9   OUT AND SIGN IT.  THESE DOCUMENTS WERE PREPARED OR CREATED BY

10  SOMEBODY OTHER THAN MYSELF.

11          I DON'T KNOW WHO -- WELL, ACTUALLY I DO KNOW WHO

12  CREATED THEM.  IT WAS MR. ROTHSTEIN ALONG WITH ANOTHER

13  GENTLEMAN, BUT I DIDN'T CREATE THESE DOCUMENTS.  ALL I DID

14  WAS -- MR. ROTHSTEIN WOULD GIVE ME A PLAINTIFF'S NAME, I WOULD

15  TYPE THE PLAINTIFF'S NAME INTO THE DOCUMENT, PRINT IT OUT, SIGN

16  IT, AND HAND IT OVER TO MR. ROTHSTEIN.

17          THE COURT:  DOES THE GOVERNMENT HAVE ANYTHING

18  ADDITIONAL ON THAT POINT?

19          MR. KAPLAN:  WELL, SHE MADE UP THE NAMES OF THESE

20  PLAINTIFFS, THESE PURPORTED PLAINTIFFS AND DEFENDANTS.  THAT

21  WAS ANOTHER PART OF THE --

22          THE COURT:  EVERYTHING WAS A FAKE --

23          MR. KAPLAN:  YES.

24          THE COURT:  -- ON THESE DOCUMENTS.

25          MR. KAPLAN:  ALTHOUGH I THINK WHAT SHE IS SAYING IS,

 1  SHE DIDN'T CREATE THE DOCUMENTS BUT SHE WAS THE ONE WHO PUT ALL

 2  OF THESE DOCUMENTS TOGETHER, AND THAT WAS PART OF HER FUNCTION.

 3          THE COURT:  ALL RIGHT.  THANK YOU.

 4          MR. STICKNEY:  YOUR HONOR, MR. ROTHSTEIN WOULD GIVE

 5  HER THE NAMES.

 6          THE COURT:  ALL RIGHT.  I AM JUST -- OKAY.  AND THEN

 7  YOU RECEIVED THE MASERATI --

 8          THE DEFENDANT:  YES, YOUR HONOR.

 9          THE COURT:  -- AT THE CHRISTMAS PARTY IN DECEMBER OF

10  2008.

11          THE DEFENDANT:  YES, YOUR HONOR.

12          MR. STICKNEY:  YOUR HONOR, MY CLIENT REMAINS UNDER

13  OATH FROM THE CHANGE OF PLEA HEARING IF YOU WANT TO WORK IT

14  THAT WAY, OR IF YOU WANT TO RESWEAR HER.

15          THE COURT:  WELL, THAT IS ALL RIGHT.

16          MR. STICKNEY:  THANK YOU.

17          THE COURT:  AND WHEN WAS THE HOUSE MADE AVAILABLE TO

18  YOU AND THE CHILDREN?

19          THE DEFENDANT:  ABOUT SIX WEEKS AFTER THE MURDER.  SO

20  MARCH -- IN APRIL.

21          THE COURT:  SO SOMETIME IN APRIL OF 2008 --

22          THE DEFENDANT:  YES, YOUR HONOR.

23          THE COURT:  -- THE HOUSE WAS MADE AVAILABLE.

24          THE DEFENDANT:  AH-HUH.

25          THE COURT:  AND WHEN WAS YOUR SALARY INCREASED?

1           THE DEFENDANT:  IN MAY OF 2008.

2           MR. STICKNEY:  YOUR HONOR, THAT BRINGS US TO THE

3   QUESTION --

4           THE COURT:  JUST A MOMENT.

5           MR. STICKNEY:  YES, SIR.

6           THE COURT:  I AM JUST ALSO CURIOUS ABOUT THE FACT, DID

7   ROTHSTEIN EVER TELL YOU WHY HE NEEDED YOU TO PERPETRATE -- TO

8   HELP HIM PERPETRATE HIS SCHEME?

9           THE DEFENDANT:  BECAUSE HE COULDN'T CONTINUE TO SIGN

10  THE DOCUMENTS WITH HIS SIGNATURE.  HE NEEDED THE SIGNATURES --

11  HE NEEDED THE SIGNATURES TO LOOK DIFFERENTLY, AND SO HE ASKED

12  ME TO.

13          THE COURT:  AND THAT IS WHAT HE TOLD YOU.

14          THE DEFENDANT:  YEAH.  BUT IT WAS TO BE A ONE TIME

15  THING.  WHEN HE FIRST APPROACHED ME HE SAID, "YOU KNOW, I

16  SIGNED THESE OTHER DOCUMENTS."  HE HAD A STACK THAT HE HAD

17  SIGNED.  HE SAID, "I NEED YOU TO SIGN THESE.  I NEED THE

18  SIGNATURES TO LOOK DIFFERENT."  AND, SO INITIALLY I DIDN'T, BUT

19  ULTIMATELY OBVIOUSLY I DID GO BACK AND SIGN THE DOCUMENTS.

20          THE COURT:  AND APPROXIMATELY WHEN DID HE TELL YOU

21  THAT?

22          THE DEFENDANT:  THAT WOULD HAVE BEEN IN JANUARY --

23  LET'S JUST SAY JANUARY OF 2008.

24          BUT I HAD BEEN -- I HAD BEEN PREPARING THESE

25  DOCUMENTS, OR DOING AS I SAID INSERTING THE PLAINTIFF'S NAME

1  AND EVERYTHING, AND I WOULD TAKE THE ENTIRE DEAL PACKETS TO

2  MR. ROTHSTEIN.  THEN HE WOULD DO WITH IT WHATEVER HE DID WITH

3  IT.  I DIDN'T REALIZE THAT THEY WERE NOT LEGITIMATE UNTIL

4  JANUARY HE CALLED ME IN AND HAD ME SIGN THE DOCUMENTS, AND

5  THAT'S WHEN I REALIZED THESE DOCUMENTS WEREN'T LEGITIMATE, THAT

6  HE HAD BEEN SIGNING THEM OR SOMEBODY HAD BEEN SIGNING THEM AND

7  THEN I STARTED SIGNING THEM.

8          MR. STICKNEY:  SO I THINK WHAT MY CLIENT IS SAYING --

9          THE COURT:  ALL RIGHT.  THANK YOU, MISS VILLEGAS.  YOU

10  CAN BE SEATED.

11          MR. KAPLAN:  YOUR HONOR, I THINK THERE WERE A COUPLE

12  OF OTHER THINGS THAT I THINK SHE -- I BELIEVE SHE WAS DOING.

13  ONE WAS, THERE WERE LETTERS GOING OUT, ONE IN PARTICULAR UNDER

14  THE NAME OF A BANK OFFICIAL, SHE CUT AND PASTE AND BASICALLY

15  PUT THAT INDIVIDUAL'S NAME OR SIGNATURE IN THERE AND THAT WAS

16  ONE OF THE OTHER THINGS.

17          THE COURT:  GOING OUT TO THE INVESTORS?

18          MR. KAPLAN:  YES.

19          THE DEFENDANT:  I DID NOT -- I DID NOT CUT AND PASTE

20  THAT NAME ONTO THE LETTER.  MR. ROTHSTEIN DID WITH THE PERSON'S

21  PERMISSION.

22          MR. STICKNEY:  WHO WAS THAT?

23          THE DEFENDANT:  FRANK SPANOSA WITH TD BANK.  BUT I WAS

24  NOT THE ONE WHO CUT AND PASTED THAT NAME.  MR. ROTHSTEIN DID

25  THAT HIMSELF.

```
 1              MR. STICKNEY:  INFORM THE JUDGE OF WHO SPANOSA IS,
 2    PLEASE.
 3              THE DEFENDANT:  HE WAS THE FORMER PRESIDENT I BELIEVE
 4    OF TD BANK.
 5              THE COURT:  ALL RIGHT.  THANK YOU.
 6              ANYTHING ELSE, MR. STICKNEY, BEFORE I HEAR FROM THE
 7    GOVERNMENT?
 8              MR. STICKNEY:  NO, YOUR HONOR.  I HOPE WE HAVE
 9    ANSWERED YOUR QUESTIONS.
10              THANK YOU VERY MUCH.
11              THE COURT:  THANK YOU.  ALL RIGHT.
12              MR. STICKNEY:  OH, YOUR HONOR, I'M SORRY.  THERE IS
13    ONE OTHER THING.
14              THIS MORNING TODAY I WAS APPROACHED BY A PARTNER WITH
15    CONRAD SHERR LAW FIRM, THAT'S MAXINE STRUDER, SHE IS IN THE
16    FIRST ROW HERE.  SHE CAME PREPARED TO TESTIFY.  OF COURSE, IT
17    IS NOT NECESSARY.  BUT MY CLIENT IS NOT ONLY ASSISTING THE
18    GOVERNMENT IN WHAT THEY ARE DOING CRIMINALLY, SHE AS I SAID,
19    REGARDING HER REMORSE WHEN APPROACHED -- WHEN I WAS APPROACHED
20    BY CIVIL LAW FIRMS WE HAVE BEEN WORKING WITH CONRAD SHEER TO
21    ASSIST THEM IN WHATEVER WAY WE CAN TO -- WITHOUT DAMAGING THE
22    CRIMINAL INVESTIGATION, WHICH IS DIFFICULT BECAUSE YOU ARE
23    CREATING JENCKS IF YOU ACTUALLY MAKE SWORN STATEMENTS.  SO WE
24    HAVE PROFFERED A LIST OF MAYBE 10 OR 15 PAGES OF QUESTIONS THAT
25    WE PROVIDED ANSWERS TO THAT THEY CAN RELY ON AS THE TRUTH SO
```

 1  THAT THEY UNDERSTAND HOW TO PROCEED WITH THEIR REPRESENTING I

 2  THINK 167 VICTIMS --

 3      MS. STRUDER:  A HUNDRED AND SIXTY MILLION.  WE'VE GOT

 4  34 PLAINTIFFS.

 5      MR. STICKNEY:  SO SHE IS DOING EVERYTHING SHE CAN,

 6  YOUR HONOR.

 7      THE COURT:  THANK YOU.

 8      MR. STICKNEY:  I THINK IT'S SOMETHING THAT YOU CAN

 9  CONSIDER.

10      THE COURT:  ALL RIGHT.  LET ME HEAR FROM THE

11  GOVERNMENT.

12      MR. KAPLAN:  THANK YOU, YOUR HONOR.

13      LET ME JUST SPEAK FIRST TO THE VARIANCE.

14      WITH RESPECT TO IT, WE LOOK AT THE 3553 FACTORS AND

15  YOU START WITH THE NATURE AND CIRCUMSTANCES OF THE OFFENSE.  I

16  DON'T THINK I HAVE TO EDUCATE THE COURT AS TO THE EXTENT AND

17  THE SCOPE OF THIS OFFENSE.  THERE WAS A 430 MILLION DOLLARS

18  LOSS APPROXIMATELY --

19      THE COURT:  USE THAT MICROPHONE NOW.

20      MR. KAPLAN:  430 MILLION DOLLAR LOSS, IT AFFECTED

21  HUNDREDS OF PEOPLE.  THERE IS RESTITUTION THAT'S DUE AND OWING

22  IN EXCESS OF 300 MILLION DOLLARS.  I THINK WE HEARD TODAY -- I

23  MEAN, MR. ROTHSTEIN NEEDED SOMEBODY THAT HE COULD TRUST.  AND

24  BY TRUST YOU CAN'T EFFECTUATE A SCHEME LIKE THIS WITHOUT GOING

25  TO SOMEBODY THAT IS GOING TO BE LOYAL AND IS NOT GOING TO BLOW

 1   THE WHISTLE.  I MEAN, IT ONLY MAKES SENSE.

 2        SHE WAS ONE OF THOSE PEOPLE THAT HE CAN TRUST, AND

 3   PROBABLY TRUST MORE THAN ALMOST ANYBODY ELSE.  AND MAYBE THE

 4   COURT MIGHT NOT APPRECIATE BECAUSE YOU DIDN'T HAVE

 5   MR. ROTHSTEIN'S CASE, BUT THIS WAS A SCHEME THAT EVOLVED.

 6   INITIALLY IT WAS WHAT THEY CALL BRIDGE LOANS, SMALL LOANS.

 7   ROTHSTEIN WOULD GO TO HIS CLIENTS SAY IT WAS FOR SOMEBODY ELSE,

 8   IT WAS REALLY FOR HIM.  THAT'S HOW THE PONZI SCHEME STARTED.

 9   BUT LIKE ANY OTHER SCHEME IT STARTS SMALL AND ONCE YOU START

10   BEING SUCCESSFUL IN YOUR FRAUD IT GROWS AND GROWS.

11        IN ORDER TO -- WHEN IT STARTS THE GROW YOU HAVE

12   INVESTORS, OR INDIVIDUALS WHO MAYBE A LITTLE BIT MORE

13   SOPHISTICATED AND YOU NEEDED DOCUMENTATION.  IN ORDER TO MAKE

14   THIS SCHEME EXPAND YOU NEEDED TO MAKE IT LOOK LIKE THIS IS

15   REALLY HAPPENING, AND THAT WAS WHEN THE DOCUMENTATION BEGAN;

16   THE SETTLEMENT AGREEMENTS, THE PERSONAL GUARANTEES, THE DEFENSE

17   AGREEMENTS, THE SALE AND TRANSFER AGREEMENTS, THE

18   ACKNOWLEDGMENT OF ASSIGNMENT AND PURCHASE OF SETTLEMENT

19   PROCEEDS, THE GUARANTEE AGREEMENTS, THE ASSIGNMENTS.  SO THOSE

20   ARE DOCUMENTS THAT HAD TO BE -- WELL, SHE DIDN'T CREATE THE

21   DOCUMENTS BUT SHE PUT THEM ALL TOGETHER.

22        BUT WHAT SHE ALSO DID IS, SHE WAS INVOLVED IN FORGING

23   THESE NAMES AND PUTTING TOGETHER THE DEAL FOLDERS.  THERE WERE

24   OVER 600 OF THESE DEALS THAT WERE DONE FROM THE END OF

25   SEPTEMBER OF 2007 THROUGH OCTOBER OF 2009.  AND SHE WAS -- AT

 1  LEAST HAD SOME INVOLVEMENT, WHETHER SHE -- SHE ALSO DIRECTED

 2  OTHER INDIVIDUALS, AT LEAST ONE OTHER INDIVIDUAL WHEN SHE WAS

 3  NOT THERE AS TO WHAT TO DO, BECAUSE THESE THINGS HAD TO BE

 4  DONE.  IT HAD TO BE DONE IN A CERTAIN WAY, IN A CERTAIN MANNER,

 5  AND HAD TO RESPECT MR. ROTHSTEIN'S PRIVACY OR ELSE THIS -- THIS

 6  THING WOULD HAVE COME DOWN.

 7          THE COURT:  IT COLLAPSES.

 8          MR. KAPLAN:  SO SHE -- IT WAS A VERY CRITICAL PART,

 9  BECAUSE IF IT WAS DONE SLOPPILY, IF IT WAS DONE IN A MANNER --

10  OR IF IT WASN'T DONE AT ALL IT WOULD HAVE BEEN VERY DIFFICULT.

11          AND IN LOOKING AT IT, I THINK IT WOULD BE DIFFICULT --

12  IT WOULD HAVE BEEN DIFFICULT FOR MR. ROTHSTEIN TO CHOOSE

13  SOMEBODY ELSE.  IS IT POSSIBLE HE COULD HAVE GOTTEN SOMEBODY

14  ELSE?  YES.  OF COURSE IT'S POSSIBLE, AND I'M CERTAIN THAT

15  OTHER PEOPLE COULD HAVE BEEN SEDUCED LIKE WITH WHETHER IT'S THE

16  PAY, OR WHATEVER IT WAS, YOU KNOW, $250,OOO AND WHATEVER ELSE

17  THAT WAS BEING PROVIDED.

18          BUT, IN FACT, SHE REALLY SEEMED TO BE THE ONE WHO WAS

19  KIND OF A VERY ESSENTIAL PLAYER.  SHE KEPT THESE FOLDERS.  AND

20  WHAT WAS ALSO HAPPENING IS, THERE WAS -- I MEAN, THERE WAS A

21  VERIFIER, SOMEBODY WHO WAS SUPPOSED TO COME IN.  SHE WAS THE

22  ONE WHO KIND OF WAS ABLE TO SHOW THEM CERTAIN DOCUMENTS, MAYBE

23  NOT OTHER DOCUMENTS.  SO SHE WAS -- SHE WAS CLEARLY INVOLVED

24  AND REALLY AN ESSENTIAL PLAYER, AND SOMEBODY THAT IF IT WASN'T

25  FOR HER ASSISTANCE IT WOULD HAVE BEEN DIFFICULT, MAYBE NOT FOR

1   HIM TO PERPETUATE THE SCHEME, MR. ROTHSTEIN.  I DON'T WANT TO

2   UNDERESTIMATE THE RESOURCEFULNESS OF MR. ROTHSTEIN, BUT

3   CERTAINLY THE SCOPE OF IT AND THE WAY IT WOULD HAVE PULLED OUT

4   WOULD HAVE BEEN MUCH DIFFERENT.

5          IN ADDITION YOU LOOK AT 3553(A)(2), AND YOU LOOK AT

6   THE SERIOUSNESS OF THE OFFENSE AND TO PROMOTE RESPECT FOR THE

7   LAW, TO PROMOTE -- AND TO PROVIDE FOR JUST PUNISHMENT FOR THE

8   OFFENSE.

9          I THINK YOU ASKED WHAT SHE WOULD HAVE RECEIVED IF IN

10  FACT WE DIDN'T CHARGE THE MONEY LAUNDERING CONSPIRACY, THE --

11  WHICH HAS A MAXIMUM SENTENCE OF 1O YEARS.

12         THE COURT:  AND JUST SO THE GOVERNMENT IS CLEAR,

13  BECAUSE I THINK THIS IS AN IMPORTANT POINT FOR YOU TO MAKE

14  CLEAR IN THE COURTROOM.

15         I AM NOT ASKING THE GOVERNMENT, NOR IS THE GOVERNMENT

16  REQUIRED TO GIVE ITS REASONS TO THE COURT FOR ANY CHARGING

17  DECISION SO I AM NOT ASKING YOU FOR THAT.  I AM NOT ASKING YOU

18  TO ARTICULATE YOUR REASONS.  I AM JUST ASKING YOU TO MAKE AS

19  CLEAR AS YOU CAN WHAT THE SITUATION MIGHT HAVE BEEN HAD THERE

20  BEEN AN INDICTMENT RETURNED VERSUS THE INFORMATION WHICH WAS

21  RETURNED.

22         MR. KAPLAN:  AND I SAY THIS UNDER 3553(A)(2), THE

23  SERIOUSNESS OF THE OFFENSE AS REFLECTED IN WHAT THE GUIDELINES

24  WOULD HAVE BEEN.  AND THE SENTENCING GUIDELINES WOULD HAVE

25  BEEN, AS YOU HAVE PREVIOUSLY STATED, 292 TO 365 MONTHS WHICH IS

 1  24 AND A HALF YEARS TO OVER 30 YEARS.  AND I THINK THE

 2  GOVERNMENT COULD HAVE CHARGED, IF IN FACT WE CHARGED

 3  SUBSTANTIVE MONEY LAUNDERING OFFENSES, IF WE WOULD HAVE CHARGED

 4  SUBSTANTIVE OR CONSPIRACY TO COMMIT MAIL AND FIRE FRAUD, OR

 5  OTHER CHARGES THAT I THINK WOULD HAVE BEEN APPLICABLE HER

 6  GUIDELINES CERTAINLY WOULD HAVE BEEN --

 7          THE COURT:  MUCH HIGHER.

 8          MR. KAPLAN:  -- MUCH HIGHER AND WOULDN'T HAVE BEEN

 9  LIMITED AND CAPPED AS THEY ARE TODAY TO 120 MONTHS.

10          THE COURT:  SO YOU ARE SAYING THAT BY THAT DECISION

11  THE GOVERNMENT IS GOING TO CERTAINLY SAY THAT THE DEFENDANT HAS

12  ALREADY RECEIVED A TREMENDOUS BENEFIT.

13          MR. KAPLAN:  WELL, I DON'T THINK THERE IS ANY QUESTION

14  THAT SHE HAS.  AND I THINK -- AND I DON'T WANT TO MINIMIZE THE

15  FACT THAT OBVIOUSLY IT'S BENEFICIAL TO THE GOVERNMENT, IT'S

16  BENEFICIAL TO THE COURT SYSTEM, AND WE RECOGNIZE THE FACT THAT

17  WHEN INDIVIDUALS EARLY ON RECOGNIZE THEIR RESPONSIBILITIES AND

18  WANT TO COME IN WE HAVE CERTAIN CONSIDERATIONS.

19          SO, YES, THIS IS A SERIOUS OFFENSE, AND IN THIS

20  OFFENSE WE NEED TO PROMOTE RESPECT FOR THE LAW AND AGAIN TO

21  PROVIDE JUST PUNISHMENT FOR THE OFFENSE.

22          IN ADDITION, UNDER 3553(A)(3) WE HAVE TO AFFORD

23  ADEQUATE DETERRENT CRIMINAL CONDUCT.  IT SEEMS LIKE LATELY,

24  MAYBE IT'S A FUNCTION OF THE ECONOMY, AN EPIDEMIC OF PONZI

25  SCHEMES THAT HAVE GONE ARISE, AND LARGE, SOME LARGER THAN THIS,

 1  AND I THINK IT'S SOMETHING THAT OBVIOUSLY INDIVIDUALS THOUGHT

 2  THAT THEY CAN GET AWAY WITH FOR SOME REASON OR ANOTHER, OR HAD

 3  GOTTEN AWAY WITH.

 4         I MEAN, THE MADOFF CASE, IT WAS 20 YEARS, ROTHSTEIN

 5  WAS ONLY FOUR.  SO I THINK THERE HAS TO BE SOME THOUGHT AS TO

 6  PEOPLE WHO ALSO ASSIST IN THESE SCHEMES UNDERSTAND THEIR

 7  RESPONSIBILITIES BEFORE IT'S TOO LATE.

 8         IN ADDITION, I THINK THERE IS A SECTION UNDER

 9  SENTENCING DISPARITIES AND, OF COURSE, MR. ROTHSTEIN WAS

10  SENTENCED TO 50 YEARS.  SO CERTAINLY THERE ISN'T A DISPARITY

11  THAT'S THE ONLY DEFENDANT WHO HAS BEEN SENTENCED.  NOW, AT SOME

12  POINT THERE MAY BE OTHERS, BUT CERTAINLY HER SENTENCE BEING

13  CAPPED AT 10 YEARS IS BENEFICIAL.

14         SO I THINK IN LOOKING AT ALL OF THAT, AND LOOKING AT

15  ALL THE CONSIDERATIONS -- AND I APPRECIATE HER FAMILY

16  CONSIDERATIONS, BUT I THINK THE COURT POINTED OUT THE FACT THAT

17  OBVIOUSLY THIS IS SOMETHING HAS BEEN GOING ON NOT RECENTLY BUT

18  SOMETHING THAT'S BEEN GOING ON FOR A LONG TIME, AND EVEN DURING

19  THE COURSE OF THE EVENTS WHERE SHE WAS COMMITTING CRIMES, OR

20  WAS INVOLVED IN CRIMINAL ACTIVITY.  SO IT'S SOMETHING THAT

21  OBVIOUSLY SHE COULD HAVE CONSIDERED BEFORE WHILE SHE WAS

22  COMMITTING THE CRIMINAL ACTIVITY THE EFFECT IT MIGHT HAVE HAD

23  ON HER FAMILY SITUATION, BUT UNFORTUNATELY SHE DID NOT.

24         SO WITH RESPECT TO THE GOVERNMENT'S POSITION, GIVEN

25  ALL THE 3553 FACTORS WE DON'T BELIEVE A VARIANCE IS

 1 APPROPRIATE.  WE DO BELIEVE THE COURT UNDER -- I BELIEVE IT WAS

 2 RODRIGUEZ HAS THE DISCRETION TO GO DOWN FROM 10 YEARS.  I

 3 THINK -- AS MR. STICKNEY SAID IT WOULD BE -- I THINK WOULD BE

 4 APPROPRIATE IT'S A MEASURE REDUCTION GIVEN IN CONSIDERATION

 5 THREE POINTS FOR ACCEPTANCE, WHICH I THINK WOULD BRING HER DOWN

 6 TO THE LOW END OF THE GUIDELINES OF 87 MONTHS.  BUT IF THE

 7 COURT IS INCLINED TO TAKE AT ALL, WE BELIEVE IT WOULD CLEARLY

 8 BE NOT APPROPRIATE TO GO ANYTHING BELOW THAT.

 9          THE COURT:  ALL RIGHT.  THANK YOU.

10          LET ME ASK THE GOVERNMENT -- WELL, THAT IS ALL RIGHT,

11 I WILL ASK IT LATER ON.  THAT IS ALL RIGHT.

12          MISS VILLEGAS, IF YOU WILL STEP UP TO THE PODIUM,

13 PLEASE.

14          DEBRA VILLEGAS, YOU NOW BEING AGAIN BEFORE THIS COURT

15 ACCOMPANIED BY YOUR LAWYER, AND YOU PREVIOUSLY HAVING PLED

16 GUILTY TO THE OFFENSE CHARGED IN THE ONE COUNT INFORMATION OF

17 THE UNITED STATES OF AMERICA VERSUS DEBRA VILLEGAS, CASE NUMBER

18 10-60126-CR-ZLOCH OF THE UNITED STATES DISTRICT COURT FOR THE

19 SOUTHERN DISTRICT OF FLORIDA, AND THE COURT HAVING PREVIOUSLY

20 ADJUDGED YOU GUILTY OF THE OFFENSE CHARGED IN THAT ONE COUNT

21 INFORMATION, DO YOU OR DOES ANYONE ON YOUR BEHALF NOW HAVE ANY

22 LEGAL REASON TO SHOW WHY THE SENTENCE OF THE LAW SHOULD NOT BE

23 PRONOUNCED UPON YOU.

24          THE DEFENDANT:  NO, SIR.

25          THE COURT:  NO LEGAL REASON HAVING BEEN SHOWN AS TO

 1 WHY SENTENCE SHOULD NOT NOW BE IMPOSED, THE COURT WILL RECEIVE

 2 WHATEVER INFORMATION OR EVIDENCE MAY BE ON OFFERED IN

 3 EXTENUATION OR IN MITIGATION OF PUNISHMENT OR WHICH IS

 4 OTHERWISE RELEVANT TO THE SENTENCE TO BE IMPOSED.

 5        MR. STICKNEY, ANY ADDITIONAL COMMENTS BEFORE I HEAR

 6 FROM YOUR CLIENT?

 7        MR. STICKNEY:  YOUR HONOR, ONLY THAT I BELIEVE THAT

 8 THIS COURT SPECIFICALLY CAN RELATE TO LOYALTY AS SOMETHING THAT

 9 WE WERE TAUGHT WHEN WE WERE RAISED, WHEN WE WENT TO THE

10 UNIVERSITY, WHEN WE SERVED OUR COUNTRY.  AND WHEN WE AS YOUNG

11 OFFICERS IN THE NAVY CONSIDERED DOING WHAT OUR COMMANDING

12 OFFICERS TOLD US TO DO, WE DIDN'T ALWAYS THINK ABOUT WHETHER

13 IT'S LEGAL OR NOT LEGAL.  WE NORMALLY JUST DID TRUSTING THAT

14 OUR SUPERIOR OFFICERS WERE DOING THE RIGHT THING AND WERE NOT

15 COMMITTING CRIMES.

16        NOW, AS LAWYERS WE UNDERSTAND THAT LAWYERS ARE BOUND

17 BY A CODE OF ETHICS THAT OTHERS AREN'T BOUND BY, AND SOCIETY

18 HAS THE RIGHT TO TRUST LAWYERS NOT TO LIE TO THEM AND NOT TO

19 GET THEM INTO TROUBLE.  DEBRA VILLEGAS WAS A LOYAL SOLDIER OF

20 SCOTT ROTHSTEIN TO HER DETRIMENT, AND HER CRIME IS DOING IT

21 KNOWING THAT HE WAS TELLING HER TO DO SOMETHING THAT WAS

22 ILLEGAL ASKING HER TO, PLEADING FOR HER TO DO IT, AND SHE DID

23 IT.  SHE IS FULLY RESPONSIBLE FOR THAT.

24        BUT HER REMORSE FOR IS WHAT I THINK MAKES ALL THE

25 DIFFERENCE, ALL THE DIFFERENCE IN THE WORLD WITH MISS VILLEGAS

1   TO THE DEGREE THAT SHE FORFEITED HER HOUSE IN COVINGTON ROAD IN

2   WESTON, WITH VOLUNTARILY TO AUSA LARRY WHO IS SITTING IN COURT

3   HERE TODAY, AND EVEN AFTER SHE LEFT THE HOUSE SHE PAID PROPERTY

4   TAXES ON IT, $8,000 WORTH.

5        WHEN SHE RETURNED THE MASERATI THERE WAS WARRANTEE

6   WORK TO BE DONE TO INCREASE THE VALUE OF THAT CAR REPLACING THE

7   INTERIOR.  SHE WENT TO GREAT LENGTHS TO MAKE SURE THAT THAT CAR

8   GOT BACK TO THE DEALERSHIP WELL AFTER SHE HAD FORFEITED TO THE

9   GOVERNMENT SO THAT THEY WOULD GET THE MAXIMUM AMOUNT OF MONEY

10  FOR THAT HOUSE WHEN THEY SERVED IT.

11       WHEN THE MARSHALS CAME TO SEIZE HER HOUSE AND PUT IT

12  ON THE MARKET WITH A REALTOR, MISS VILLEGAS HAD HOME REPAIRMEN

13  IN THERE FIXING THE HOUSE KNOWING SHE WAS LOSING THE HOUSE.

14  SHE IS NOT THE TYPICAL DEFENDANT THAT THIS COURT SEES.  SHE HAS

15  COMMITTED A CRIME.

16       AGAIN, I JUST REQUEST BEFORE SHE SPEAKS TO YOU THAT

17  YOU CONSIDER THAT AND THE IMPACT ON HER FAMILY AS A VARIANCE

18  FACTOR.

19       THANK YOU, YOUR HONOR.

20       THE COURT:  ALL RIGHT.  THANK YOU.

21       MISS VILLEGAS, WHAT WOULD YOU LIKE TO SAY?

22       THE DEFENDANT:  I WOULD JUST LIKE TO SAY THAT I'M VERY

23  SORRY TO ALL THE VICTIMS, TO THE EMPLOYEES WHO LOST THEIR JOBS

24  AND HAVING TO START THEIR LIVES OVER, TO MY FAMILY WHO I

25  DISAPPOINTED AND BROUGHT SHAME TO AND I LOVE WITH ALL MY HEART.

1          I HOPE THE COURT WILL SHOW MERCY ON US TODAY, AND I

2   APOLOGIZE FOR EVERYTHING THAT I HAVE DONE IN THIS CRIME.

3          THE COURT:  MISS VILLEGAS, LET ME ASK YOU.

4          I HAVE HEARD FROM DOCTOR BUTTS, AND YOU WROTE THE

5   COURT AND YOU EXPRESSED ALL OF THE CONCERNS ABOUT YOUR

6   CHILDREN, AND DOCTOR BUTTS TESTIFIED TO THAT AS WELL.  WHERE

7   WAS THE CONCERN FOR YOUR CHILDREN WHEN YOU WERE ENGAGING IN

8   THIS CRIMINAL ACTIVITY?

9          THE DEFENDANT:  WELL, MR. ROTHSTEIN INITIALLY ASKED ME

10  TO DO IT, IT WAS A ONE TIME THING.  I THOUGHT THAT WAS IT.

11  THEN THE MURDER CAME, AND MY MIND WAS NOT WHERE IT SHOULD HAVE

12  BEEN.  MR. ROTHSTEIN CONTINUED TO ASK ME EVERY SINGLE TIME,

13  "THIS IS THE LAST TIME.  THIS IS THE LAST TIME.  THIS IS THE

14  LAST TIME."

15         I WAS JUST THINKING ABOUT GETTING THAT DONE, GETTING

16  MY JOB DONE, AND GETTING HOME TO TAKE CARE OF MY CHILDREN AND

17  MY HOME THAT WAS A TOTAL WRECK.  IT WAS A HUGE GRAVE MISTAKE ON

18  BEHALF OF MY FAMILY, AND THERE ARE NOT ENOUGH WORDS TO

19  APOLOGIZE TO MY FAMILY FOR WHAT I'VE DONE TO THEM.

20         THE COURT:  ALL RIGHT.  THANK YOU.

21         ANYTHING ELSE FROM THE DEFENSE, MR. STICKNEY?

22         MR. STICKNEY:  NO, YOUR HONOR.  THANK YOU.

23         THE COURT:  WHAT SAY THE UNITED STATES?

24         MR. KAPLAN:  YOUR HONOR, I THINK WITH RESPECT TO OUR

25  RECOMMENDATION I PREVIOUSLY STATED TO THE COURT THERE ARE JUST

 1  A COUPLE OF OTHER MATTERS I THINK THAT WE HAVE TO ADDRESS.  ONE
 2  IS WITH RESPECT TO FORFEITURE.
 3       WE ASK -- THE UNITED STATES MOVES THAT THE PRELIMINARY
 4  ORDER OF FORFEITURE, DOCKET ENTRY 25, BE PRONOUNCED AS PART OF
 5  THE DEFENDANT'S SENTENCE AND BE INCORPORATED BY REFERENCE INTO
 6  THE J&C.
 7       IN ADDITION, THERE IS RESTITUTION THAT IS OWED
 8  ACCORDING TO PARAGRAPH 76 OF THE PSI.  RESTITUTION IS ORDERED
 9  IN THE AMOUNT OF -- SHOULD BE ORDERED IN THE AMOUNT OF
10  $363,172,140.26 TO THE 327 VICTIMS OF THE OFFENSE.
11       WE PREVIOUSLY HAD A RESTITUTION HEARING BEFORE JUDGE
12  COHN AND THAT IS THE AMOUNT THAT CAME.  NOW, I DON'T KNOW
13  WHETHER OR NOT BECAUSE THAT WAS JUST PROVIDED ABOUT A WEEK AGO,
14  I DON'T KNOW WHETHER OR NOT THE DEFENSE WANTS ADDITIONAL TIME,
15  BUT THAT IS THE AMOUNT WE ASK THAT THAT BE ORDERED, YOUR HONOR,
16  AS PART OF THE --
17            THE COURT:  DOES THE DEFENSE OBJECTS TO THAT AMOUNT?
18            MR. STICKNEY:  NO, YOUR HONOR.
19            THE COURT:  ALL RIGHT.
20            MR. KAPLAN:  AND I THINK THAT'S IT, YOUR HONOR.
21            THE COURT:  LET ME ASK THE GOVERNMENT.
22       IS THERE THE POSSIBILITY -- I KNOW THAT THE DECISION
23  IS UP TO THE GOVERNMENT.  IS THERE THE POSSIBILITY THAT THERE
24  MAY BE A RULE 35 MOTION?
25            MR. KAPLAN:  THERE IS A POSSIBILITY, YOUR HONOR, YES,

 1  SIR.

 2              ANY OTHER QUESTIONS, YOUR HONOR?

 3              THE COURT:  NO.  THANK YOU VERY MUCH.

 4              I GUESS I DO HAVE AN ADDITIONAL QUESTION OR TWO FOR

 5  THE GOVERNMENT.

 6              WHEN THE GOVERNMENT FIRST MET WITH THE DEFENDANT AND

 7  WAS DEBRIEFING THE DEFENDANT, WHAT WAS YOUR IMPRESSION OF

 8  MISS VILLEGAS?

 9              DO YOU UNDERSTAND MY QUESTION?

10              MR. KAPLAN:  NOT FULLY.

11              THE COURT:  IN OTHER WORDS, THE DEFENSE HAS ASKED ME

12  TO GET INTO THE HEAD OF MISS VILLEGAS WITH RESPECT TO THE

13  MOTION FOR A DOWNWARD DEPARTURE, AND THAT'S VERY DIFFICULT TO

14  DO.

15              MR. KAPLAN:  YES.

16              THE COURT:  AND, SO MY QUESTION TO YOU IS, WHEN YOU

17  MET WITH MISS VILLEGAS AND SHE -- AND YOU WERE DEBRIEFING HER,

18  WAS SHE TOTALLY FAMILIAR WITH THE OPERATION AT THE LAW FIRM,

19  WITH THE ROTHSTEIN OPERATION?  DID SHE APPEAR TO YOU AS TO BE

20  SOMEONE WHO HAD BEEN -- WAS JUST SOME POOR LOST SOUL WHO HAD

21  BEEN USED?

22              MR. KAPLAN:  NO.  SHE ADMITTED THAT SHE HAD KNOWLEDGE

23  OF THE SCHEME AND WHAT'S WAS GOING ON.  MUCH OF WHAT SHE, YOU

24  KNOW, SHE PORTRAYED TODAY.  I THINK A LOT OF THAT CAME FORWARD

25  INITIALLY.

```
 1          THE COURT:  SO IN SPITE OF HER -- WELL, HER -- THE PSR
 2  REFLECTS THAT SHE HAS A HIGH SCHOOL EDUCATION AND THEN A ONE
 3  SEMESTER AT A COMMUNITY COLLEGE.  SO SHE IMPRESSED YOU AS
 4  SOMEONE WITH THE LIMITED EDUCATION THAT SHE HAS WAS AT LEAST
 5  STREET SMART ENOUGH TO KNOW EXACTLY WHAT WAS GOING ON.
 6          MR. KAPLAN:  YES.  PLUS I -- I THINK IT WAS CLEAR.
 7  SHE WAS RUNNING -- SHE WAS AN OFFICE MANAGER FOR A 70 MEMBER
 8  LAW FIRM.  SO SHE WAS ABLE, AS I THINK THE -- THE PSYCHOLOGIST
 9  SAID, SHE WAS ABLE TO GET IT TOGETHER I ASSUME WHEN SHE NEEDED
10  TO, BUT SHE KIND OF RULED THAT LAW FIRM.  SO SHE WAS -- SHE WAS
11  ABLE TO KIND OF GET IT TOGETHER.  AND, SO SHE WAS ABLE -- SHE
12  HAD THOSE SORTS OF SMARTS AND THOSE SORTS OF ABILITIES.
13          THE COURT:  ALL RIGHT.  THANK YOU.
14          ALL RIGHT, MISS VILLEGAS, IF YOU WILL STEP UP TO THE
15  PODIUM, PLEASE.
16          WHAT WAS THE DOCKET ENTRY NUMBER OF THE PRELIMINARY
17  ORDER OF FOR FORFEITURE?
18          MR. KAPLAN:  DOCKET ENTRY 25, YOUR HONOR.
19          THE COURT:  TWENTY-FIVE.  ALL RIGHT.  THANK YOU.
20          THE COURT BEING FULLY INFORMED OF THE FACTS AND
21  CIRCUMSTANCES SURROUNDING THE CRIME AND NO LEGAL REASON HAVING
22  BEEN SHOWN AS TO WHY SENTENCE SHOULD NOT NOW BE IMPOSED, AFTER
23  CONSIDERATION OF STATEMENTS BY ALL PARTIES AND A COMPLETE
24  REVIEW OF THE ENTIRE REVISED PRESENTENCE REPORT WHICH CONTAINS
25  THE ADVISORY GUIDELINE COMPUTATION AND RANGE WHICH THIS COURT
```

 1  HAS CONSIDERED.  THE COURT HAS ALSO CONSIDERED ALL OF THE

 2  STATUTORY FACTORS.

 3       FURTHER, IT IS THE FINDING OF THE COURT THAT

 4  MISS VILLEGAS IS NOT ABLE TO PAY BOTH A FINE AS WELL AS

 5  RESTITUTION.  THEREFORE, NO FINE SHALL BE IMPOSED.  HOWEVER,

 6  RESTITUTION SHALL BE ORDERED.

 7       ACCORDINGLY, PURSUANT TO THE SENTENCING REFORM ACT OF

 8  1984, IT IS THE JUDGMENT OF THE COURT AND THE SENTENCE OF THE

 9  LAW THAT DEBRA VILLEGAS IS HEREBY COMMITTED TO THE CUSTODY OF

10  THE UNITED STATES BUREAU OF PRISONS TO BE IMPRISONED FOR A TERM

11  OF 120 MONTHS AS TO THE ONE COUNT INFORMATION.

12       IT IS FURTHER ORDERED THAT MISS VILLEGAS SHALL PAY

13  JOINT AND SEVERAL RESTITUTION WITH SCOTT ROTHSTEIN IN CASE

14  NUMBER -- EXCUSE ME.  IN DOCKET ENTRY NUMBER 113 IN CASE NUMBER

15  09-60331-CR-COHN OF THE UNITED STATES DISTRICT COURT FOR THE

16  SOUTHERN DISTRICT OF FLORIDA IN THE AMOUNT OF $363,172,140.26.

17       DURING THE PERIODS OF INCARCERATION PAYMENT SHALL BE

18  MADE AS FOLLOWS.

19       ONE, IF MISS VILLEGAS EARNS WAGES IN A FEDERAL PRISON

20  INDUSTRIES JOB, THAT IS A UNICOR JOB, THEN SHE MUST PAY 50

21  PERCENT OF THE WAGES EARNED TOWARD THE FINANCIAL OBLIGATIONS

22  IMPOSED BY THIS JUDGMENT IN A CRIMINAL CASE.

23       TWO, IF THE DEFENDANT DOES NOT WORK IN A UNICOR JOB,

24  THEN SHE MUST PAY A MINIMUM OF $25 PER QUARTER TOWARD THE

25  FINANCIAL OBLIGATIONS IMPOSED IN THIS ORDER.

1            UPON RELEASE FROM INCARCERATION MISS VILLEGAS SHALL

2   PAY RESTITUTION AT THE RATE OF 1O PERCENT OF HER MONTHLY GROSS

3   EARNINGS UNTIL SUCH TIME AS THE COURT MAY ALTER THAT PAYMENT

4   SCHEDULE IN THE INTEREST OF JUSTICE.

5            THE UNITED STATES BUREAU OF PRISONS, THE UNITED STATES

6   PROBATION OFFICE, AND THE UNITED STATES ATTORNEY'S OFFICE SHALL

7   MONITOR THE PAYMENT OF RESTITUTION AND REPORT TO THE COURT ANY

8   MATERIAL CHANGE IN THE DEFENDANT'S ABILITY TO PAY.

9            THESE PAYMENTS DO NOT PRECLUDE THE GOVERNMENT FROM

10  USING ANY OTHER ANTICIPATED OR UNEXPECTED FINANCIAL GAINS,

11  ASSETS, OR INCOME OF MISS VILLEGAS TO SATISFY THE RESTITUTION

12  OBLIGATIONS.

13           THE RESTITUTION SHALL BE MADE PAYABLE TO THE CLERK,

14  UNITED STATES COURTS, AND FORWARDED TO THE UNITED STATES

15  CLERK'S OFFICE, ATTENTION FINANCIAL SECTION, 4OO NORTH MIAMI

16  AVENUE, ROOM 8NO9, MIAMI, FLORIDA 33128.  THE RESTITUTION WILL

17  THEN BE FORWARDED BY THE CLERK OF THE COURT TO THE VICTIMS ON

18  THE ATTACHED LIST.

19           UPON RELEASE FROM IMPRISONMENT MISS VILLEGAS SHALL BE

20  PLACED ON SUPERVISED RELEASE FOR A TERM OF THREE YEARS.

21           WITHIN 72 HOURS OF RELEASE SHE SHALL REPORT IN PERSON

22  TO THE PROBATION OFFICE IN THE DISTRICT TO WHICH SHE IS

23  RELEASED.

24           WHILE ON SUPERVISED RELEASE SHE SHALL NOT COMMIT ANY

25  CRIMES, SHE SHALL BE PROHIBITED FROM POSSESSING A FIREARM OR

 1  OTHER DANGEROUS DEVICES, SHE SHALL NOT POSSESS A CONTROLLED

 2  SUBSTANCE, SHE SHALL COOPERATE IN THE COLLECTION OF DNA, AND

 3  SHALL COMPLY WITH THE STANDARD CONDITIONS OF SUPERVISED RELEASE

 4  INCLUDING THE FOLLOWING SPECIAL CONDITION.

 5       ONE, THERE SHALL BE A MENTAL HEALTH TREAT REQUIREMENT;

 6  TWO, THERE SHALL BE A FINANCIAL DISCLOSURE REQUIREMENT; THREE,

 7  THERE SHALL BE A NO NEW DEBT RESTRICTION REQUIREMENT; AND,

 8  FOUR, THERE SHALL BE A PERMISSIBLE SEARCH REQUIREMENT, ALL AS

 9  NOTED MORE SPECIFICALLY IN PART G OF THE REVISED PSR.

10       IT IS FURTHER ORDERED THAT MISS VILLEGAS SHALL PAY

11  IMMEDIATELY TO THE UNITED STATES A SPECIAL ASSESSMENT OF $100.

12       FORFEITURE OF MISS VILLEGAS' RIGHT, TITLE, AND

13  INTEREST IN CERTAIN PROPERTY THAT HAS BEEN ALREADY ORDERED

14  PURSUANT TO THE PRELIMINARY ORDER OF FORFEITURE IS ORDERED HERE

15  TODAY.

16       DOES THAT COVER EVERYTHING, MADAM PROBATION OFFICER?

17       THE PROBATION OFFICER:  YES, IT DOES, YOUR HONOR.

18       THE COURT:  THE COURT ADOPTS THE FACTUAL FINDINGS AND

19  ADVISORY GUIDELINE COMPUTATION, THE TOTAL OFFENSE LEVEL, THE

20  CRIMINAL HISTORY CATEGORY, THE IMPRISONMENT RANGE, THE

21  SUPERVISED RELEASE RANGE, AND THE FINE RANGE AS SET FORTH IN

22  THE REVISED PSR.

23       NO FINE HAS BEEN IMPOSED FOR THE REASONS PREVIOUSLY

24  STATED.  FULL RESTITUTION HAS BEEN ORDERED.

25       THE SENTENCE IS CAPPED BY THE STATUTORY MAXIMUM AND

1  THAT IS THE SENTENCE THAT HAS BEEN IMPOSED.  THAT STATUTORY

2  MAXIMUM OBVIOUSLY IS BELOW THE GUIDELINE RANGE, BUT IT IS THE

3  STATUTORY MAXIMUM THAT GOVERNS, AND THE COURT -- THE COURT

4  FINDS NO REASON TO DEPART OR VARY FROM A SENTENCE CALLED FOR BY

5  THE STATUTORY MAXIMUM.

6       MR. STICKNEY, DOES THE DEFENSE HAVE ANY OBJECTIONS TO

7  ANY OF THE FINDINGS OF FACTS OR CONCLUSIONS OF LAW MADE BY THE

8  COURT HERE THIS MORNING?

9       MR. STICKNEY:  NO, YOUR HONOR.  WE WOULD JUST ASK THAT

10 YOU WOULD RECONSIDER YOUR RULING ON OUR VARIANCE AND OUR

11 DOWNWARD DEPARTURE.

12      THE COURT:  ALL RIGHT.  WELL, THE COURT'S PRIOR RULING

13 REMAINS THE SAME.

14      MISS VILLEGAS, DO YOU HAVE ANYTHING ADDITIONAL?

15      THE DEFENDANT:  NO.

16      THE COURT:  ANY FROM THE GOVERNMENT?

17      MR. KAPLAN?  NO, NOT THE FROM THE GOVERNMENT.

18      THE COURT:  DOES THE DEFENSE HAVE ANY OBJECTION TO THE

19 MANNER OR PROCEDURE IN WHICH SENTENCE HAS BEEN IMPOSED OR THAT

20 THIS HEARING HAS BEEN CONDUCTED, MR. STICKNEY?

21      MR. STICKNEY:  NO, YOUR HONOR.

22      THE COURT:  MISS VILLEGAS?

23      THE DEFENDANT:  NO.

24      THE COURT:  ANY FROM THE GOVERNMENT?

25      MR. KAPLAN:  NONE FROM THE GOVERNMENT.

 1            THE COURT:  MISS VILLEGAS, THE COURT NOW INFORMS YOU

 2   THAT YOU HAVE 14 DAYS FROM TODAY WITHIN WHICH TO APPEAL THE

 3   SENTENCE IMPOSED.  YOUR FAILURE TO APPEAL WITHIN THE 14-DAY

 4   TIME PERIOD SHALL CONSTITUTE WAIVER OF YOUR RIGHT TO APPEAL.

 5            IF YOU ARE WITHOUT FUNDS WITH WHICH TO RETAIN A LAWYER

 6   TO ASSIST YOU IN ANY APPEAL THE COURT WOULD APPOINT A LAWYER

 7   FOR YOU UPON A SHOWING THAT YOU WERE YOU ARE INDIGENT AND

 8   UNABLE TO AFFORD A LAWYER.

 9            IF YOU WERE DECLARED INDIGENT THE CLERK OF THE COURT

10   WOULD FILE A NOTICE OF APPEAL ON YOUR BEHALF IF YOU REQUESTED

11   THE CLERK OF THE COURT TO DO SO.

12            WHAT DOES THE GOVERNMENT SAY ABOUT VOLUNTARY

13   SURRENDER, ANY OBJECTION?

14            MR. KAPLAN:  NO OBJECTION, YOUR HONOR.

15            THE COURT:  HOW LONG DO YOU THINK IT WILL TAKE BEFORE

16   MISS VILLEGAS' COOPERATION MIGHT BE COMPLETED, SIX MONTHS?

17            MR. KAPLAN:  YES.  THAT WOULD BE AT LEAST A GOOD

18   STARTING POINT.  YES, YOUR HONOR.

19            THE COURT:  ALL RIGHT.  THE COURT WILL PERMIT

20   VOLUNTARY SURRENDER -- EXCUSE ME FOR ONE MOMENT.

21            ALL RIGHT.  THE COURT WILL PERMIT VOLUNTARY SURRENDER.

22   THE EXECUTION OF SENTENCE IS HEREBY DEFERRED.  AND,

23   MISS VILLEGAS, YOU ARE TO SURRENDER YOURSELF NO LATER THAN NOON

24   ON FRIDAY, JUNE 24, 2011, FRIDAY, JUNE 24, 2011, AT THE

25   FACILITY DESIGNATED BY THE BUREAU OF PRISONS.

          1            ANY OTHER RECOMMENDATIONS FROM THE DEFENSE?

          2            MR. STICKNEY:  THAT AN INSTITUTION -- BOP DESIGNATE MY

          3   CLIENT SOME PLACE AS CLOSE TO HER HOME AS POSSIBLE.

          4            THE COURT:  IN FLORIDA.

          5            MR. STICKNEY:  IN FLORIDA.  YES, YOUR HONOR.

          6            THE COURT:  DO THEY STILL REFER TO THEM AS CAMP

          7   FACILITIES, MADAM PROBATION OFFICER?

          8            THE PROBATION OFFICER:  I THINK IT WOULD BE COLEMAN.

          9            THE COURT:  NO.  DO THEY STILL REFER TO THEM AS CAMP

         10   FACILITIES?

         11            THE COURT RECOMMENDS A CAMP FACILITY IN SOUTH FLORIDA,

         12   IN SOUTHWEST FLORIDA.

         13            ANYTHING ELSE FROM THE DEFENSE?

         14            MR. STICKNEY:  YOUR HONOR, AS YOU KNOW, MY CLIENT IS

         15   INDIGENT, AND I DON'T KNOW WHAT THIS COURT'S PROCESS IS FOR

         16   WHETHER YOU APPOINT ATTORNEYS TO ASSIST IN A RULE 35 PROCESS.

         17   IF YOU DON'T I WILL CONTINUE TO DO IT PRO BONO.

         18            THE COURT:  NO.  JUST FILE THE APPROPRIATE MOTION IF

         19   THAT HAPPENS.  I MEAN, I HAVE NO IDEA IF IT THAT IS GONG TO

         20   HAPPEN.

         21            MR. STICKNEY:  THERE IS ONGOING COOPERATION ARE PART

         22   OF THAT.  SO HER SHE IS COOPERATING.

         23            THE COURT:  ALL RIGHT.  JUST FILE THE A APPROPRIATE

         24   MOTION AND I WILL BE GLAD TO APPOINT YOU.

         25            MR. STICKNEY:  THANK YOU, SIR.

```
 1            THE COURT:  SHE WILL NEED TO FILE A FINANCIAL
 2  AFFIDAVIT, AND SO FORTH.  I KNOW WHAT IS IN THE PSR, BUT WE
 3  WILL STILL NEED A FINANCIAL AFFIDAVIT FROM HER.
 4            MR. STICKNEY:  YES, SIR.  THANK YOU.
 5            THE COURT:  ANYTHING ELSE FROM THE DEFENSE?
 6            MR. STICKNEY:  NO, YOUR HONOR.
 7            THE COURT:  FROM THE GOVERNMENT?
 8            MR. KAPLAN:  NOTHING FROM THE GOVERNMENT.
 9            THE COURT:  ALL RIGHT, COUNSEL, THANK YOU VERY MUCH.
10  THE COURT IS IN RECESS.  EVERYONE HAVE A GREAT WEEKEND.
11                            - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1

 2

 3                    C E R T I F I C A T E

 4

 5

 6   UNITED STATES OF AMERICA

 7   SOUTHERN DISTRICT OF FLORIDA

 8

 9

10        I, CARL SCHANZLEH, OFFICIAL COURT REPORTER OF THE UNITED

11   STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA, DO

12   HEREBY CERTIFY THAT THE FOREGOING 72 PAGES CONSTITUTE A TRUE

13   TRANSCRIPT OF THE PROCEEDINGS HAD BEFORE THE SAID COURT HELD IN

14   THE CITY OF FORT LAUDERDALE, FLORIDA, IN THE MATTER THEREIN

15   STATED.

16        IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON THIS

17   28TH DAY OF FEBRUARY 2011.

18

19                         /S/CARL SCHANZLEH
                           CARL SCHANZLEH, RPR-CM
20                         OFFICIAL FEDERAL COURT REPORTER
                           299 EAST BROWARD BLVD., 202B
21                         FORT LAUDERDALE, FL  33301
                           TELEPHONE 954/769-5488
22

23

24

25
```